# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

———————

No. 06-3668

———————

Barbara Robinson; Kent Robinson,     *
   *
       Appellants,    *
   *   Appeal from the United States
     v.    *   District Court for the
   *   District of South Dakota
Brandtjen & Kluge, Inc.,    *
   *
       Appellee.    *

———————

Submitted: June 15, 2007
Filed: September 11, 2007

———————

Before LOKEN, Chief Judge, ARNOLD and COLLOTON, Circuit Judges.

———————

COLLOTON, Circuit Judge.

Barbara Robinson and her husband Kent sued Brandtjen & Kluge, Inc., ("B&K"), alleging causes of action based on strict products liability and negligence, as well as a derivative claim based on loss of consortium and a claim for punitive damages. The district court[1] granted summary judgment for B&K, and we affirm.

———————

[1]The Honorable Andrew W. Bogue, United States District Judge for the District of South Dakota.

I.

Barbara Robinson ("Robinson") worked at Clark Printing, Inc., a printing business in Spearfish, South Dakota. Clark Printing owned a printing press manufactured by B&K in 1939. While Robinson was operating the press in December 2001, her hand became lodged between the two large surfaces of the press, and she suffered severe injury to her hand. Robinson and her husband brought this diversity action against B&K, alleging negligence, strict liability, and loss of consortium under South Dakota law.

The press was a Kluge 6 Roller Automatic Platen Printing Press, which B&K sold in 1940 to a newspaper in Deadwood, South Dakota. Clark Printing acquired the press over fifty years later, in 1991 or 1992. B&K had designed the press for automatic feeding, a mechanical process in which paper is fed by a mechanical arm onto one large surface, called a "platen," before it rises to meet a second surface, called the "bed," which stores typeface that prints onto the paper. After the printing occurs, the surfaces separate, a second mechanical arm removes the paper, and the first arm then moves another piece of paper onto the platen for the next printing.

Even with the automatic feeder, however, an operator was required to use the press manually during what is described as the "make-ready" process. During this process, a test sheet of paper is printed to ensure that the press is set properly for a series of papers to be printed through use of the automatic feeder. The B&K operating instructions explained the steps necessary for the operator to disable the automatic feeder in order to undertake the make-ready process, stating that after these steps are completed, "[t]he press may now be operated in the same manner as an open press." (Robinson App. 238). The instructions contemplate that once this make-ready process is completed, the operator will reattach the automatic feeder for mechanical operation. (*Id*. at 236).

In 1996 or 1997, Clark Printing converted the press from a printing press to a foil stamping press. The foil stamping process used heat to transfer gold or silver, rather than ink, onto paper. After this conversion, Clark Printing employees fed the machine exclusively by hand. Ivan Clark, the founder and owner of Clark Printing, testified that manual feeding was more efficient for typical foil stamping jobs, most of which tended to be "short-run" jobs.

Robinson began working for Clark Printing in 1998, but had never operated the press before her injury. Janet Davidson, another employee at the firm, usually operated the press, but on December 7, 2001, a supervisor asked Davidson to perform another task and directed Robinson to perform a foil stamping job. Davidson testified that she "did not feel comfortable" with Robinson operating the press, citing the dangerous nature of the machine and Robinson's lack of experience operating it, but that Clark ordered her to show Robinson how to use it. (*Id*. at 277).

Robinson received only five to ten minutes' training, and no safety instruction, before beginning to operate the press. Robinson testified that she was unaware of the risk of feeding the press by hand, and instead focused her efforts on printing the job properly. After about fifteen minutes of operating the press, Robinson's hand became caught between the platen and the bed. Davidson quickly freed Robinson's hand, but the hand was nonetheless severely injured.

South Dakota's law limited the Robinsons' recovery against Clark Printing to claims for workers' compensation. S.D. Codified Laws § 62-3-2. The Robinsons brought suit against B&K, alleging that the machine was defectively designed and that B&K failed to warn of the defects.

The district court granted summary judgment for B&K on all claims. On the strict liability claim, the court concluded that Clark Printing modified the press by removing the automatic feeder, and that this modification was not reasonably

foreseeable by B&K. Accordingly, the court held that B&K had immunity from liability for product defects or failure to warn under S.D. Codified Laws § 20-9-10(3). On the negligence claim, the district court concluded as a matter of law that Clark Printing's modification of the press was a superseding, intervening cause that shifted liability from B&K to Clark Printing. The court also held that B&K was not liable for a post-sale failure to warn, because B&K had no duty to identify Robinson as a party to be warned, and, alternatively, because B&K had provided adequate warnings to Clark Printing. The court dismissed the claims for loss of consortium and punitive damages, because they depended on an underlying finding of strict liability or negligence. We review the district court's grant of summary judgment *de novo*, taking the facts in the light most favorable to the Robinsons.

II.

The Robinsons first challenge the district court's grant of summary judgment on their products liability claim. B&K defends the judgment on two alternative grounds. It argues that the district court correctly ruled that Clark Printing radically altered the press in a manner that was unforeseeable to B&K and, alternatively, that there was insufficient evidence to prove that the press was defective when it was sold by B&K in 1940. We may affirm on any ground supported by the record, *see Pro Service Auto., LLC v. Lenan Corp.*, 469 F.3d 1210, 1213 (8th Cir. 2006), and we find B&K's second theory persuasive.

South Dakota has adopted the rule of strict products liability as stated in the Restatement (Second) of Torts § 402A (1965). *Engberg v. Ford Motor Co.*, 205 N.W.2d 104, 109 (S.D. 1973). Section 402A makes liable "one who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property." The Supreme Court of South Dakota has not elaborated on how "defective condition" should be defined, but it has adopted section 402A of the Restatement, and that section endorses the so-called "consumer expectations test." The commentary to

section 402A provides that a product is defective if it leaves the seller "in a condition not contemplated by the ultimate consumer, which will be unreasonably dangerous to him." Restatement (Second) of Torts § 402A cmt. *g*. A product is "unreasonably dangerous" where it is dangerous "to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics." *Id*., cmt. i.

The Robinsons assert that B&K was responsible for two alleged defects in the press: (1) the failure to include a detachable point-of-operation guard to protect the user during manual operation of the automatic feeding press, and (2) the failure to warn users not to feed the press manually. We conclude as a matter of law that neither aspect of the product rendered it defective when it left B&K.

We come to this case in 2007, but we must consider whether there is sufficient evidence to support a finding that the B&K press was defective when it was sold more than sixty-five years ago, in 1940. We find instructive the analysis of the Fourth Circuit, in similar circumstances, concerning a claim for strict liability under the standards of section 402A of the Restatement. That court observed that it is inappropriate to superimpose contemporary standards of safety on an earlier era: "In short, a product can only be defective if it is imperfect when measured against a standard existing at the time of sale or against reasonable consumer expectations held at the time of sale." *Sexton v. Bell Helmets, Inc.*, 926 F.2d 331, 337 (4th Cir. 1991). To determine what was defective in an earlier period, we look to evidence of the industry practice at the time, any direct evidence of what reasonable purchasers expected, and other evidence concerning injuries or knowledge of the dangers of the product in that time. "While conformity with industry practice is not conclusive of the product's safety, because an industry could adopt a careless standard, the cases where a member of an industry will be held liable for failing to do what no one in his position has ever done before will be infrequent." *Id*. at 336 (internal quotation omitted). Consistent with this interpretation of section 402A, South Dakota law

-5-

provides that conformity with the prevailing state of the art existing at the time the product was first sold may be considered in determining whether a product was in a defective condition or unreasonably dangerous. S.D. Codified Laws § 20-9-10.1.

By 1940, the danger of operating a manual press was apparently well-known, and the industry had developed safety mechanisms in response. The automatic feeder was a major safety advance, because it allowed printing or stamping to occur without requiring the operator's hands to be placed between the platen and the bed. There is also evidence that a point-of-operation guard was recommended for use with *manually-operated* presses. An "Industrial Safety Pamphlet" published in 1936 by the National Safety Council in Chicago warned that "[a]n automatic platen guard should . . . be provided to prevent the feeder's hand or arm from being caught between the platen and the bed of the press." (Robinson App. 215).

The record shows, however, that these devices were viewed as alternative safety measures. American safety standards for job platen presses as late as the 1970s and 1980s required *either* an automatic feeder *or* a point-of-operation guard, but not both, to protect the operator against injury. Both New York and California mandated that job platen presses with or without mechanical power be provided with one of the following: (a) "an automatic feed which does not require the operator's hands to be placed between the platen and bed," (b) an automatic stop to prevent the platen from closing if the operator's hand is caught, or (c) a guard or gate that will throw the operator's hand out of the way. *See* 12 N.Y. Comp. Codes R. & Regs. tit. 12, § 19.20 (1971) (reprinted at B&K App., Ex. R); Cal. Code Regs. tit. 8, § 4436 (1986) (B&K App., Ex. R). A Handbook of Industrial Safety Standards published by the Association of Casualty and Surety Companies in 1954 likewise said that *one of those three devices* should be provided on each platen press. (B&K App., Ex. R). An advisory memorandum in 1980 from the United States Department of Education, Office of Vocational and Adult Education, to state officials similarly remarked that "[a]lternative safeguarding devices" were available for platen presses, including "[t]he

application of a presence sensing device, a pull out device, a hold out or restraint device, and/or an automatic feed." (*Id.*)

The Robinsons' contention is that B&K in 1940 was required to include both an automatic feeder and a point-of-operation guard on its machine. In support of this view, the Robinsons' expert declared that it was "technologically and economically feasible" in 1939 to design a point-of-operation guard, and that "a guard could have been designed in 1939 so it would not interfere when the mechanical feeder was used." (Robinson App. 329). The expert envisioned a guard that "would consist of the commonly used pop-up platen guard with detachable actuating rods that would be installed when the press was hand fed." (*Id.*). He opined that without this safety feature, or a warning not to feed the press manually, the press was defective. (*Id.* at 329-30). The Robinsons also point to a 1938 agreement among members of the "Platen Machine Committee" in Great Britain, which said that a machine fitted with a removable automatic feeding attachment should be provided with a guard for use when the machine is fed by hand. (*Id.* at 231). The chairman of B&K, by contrast, averred that "it was not possible to guard this type of platen printing press for use as both an automatic press and as a manually-fed press." (B&K App., Ex. 1, at 11). He asserted that any platen guard in 1939 "would have interfered with the operation of an automatic feeder and would not have survived the rigors of high-speed automatic operation for any reasonable length of time." (*Id.*).

We conclude as a matter of law that the lack of a detachable guard for use during manual feeding did not render the B&K press defective in 1940. While a manufacturer has a duty to design a product that is reasonably safe for its foreseeable use, it is not required to design the "best possible product," and "proof that technology existed, which if implemented could feasibly have avoided a dangerous condition, does not alone establish a defect." *Sexton*, 926 F.2d at 336 (internal quotations omitted). The B&K press was designed for use with an automatic feeder, which provided protection to the operator. The press could be converted for manual use

during the make-ready process, but the automatic feeder was available for use when the operator printed or stamped multiple papers or objects. The Robinsons have not provided evidence that the American platen press industry had adopted a standard that included multiple layers of safety mechanisms as of 1940, or that consumers expected this level of protection. There is no evidence of a single platen press in the United States in 1940 that was equipped with both an automatic feeder and a point-of-operation guard. And as we have recounted, the applicable regulatory standards in the United States did not mandate this design even three decades later. For these reasons, we conclude that there is insufficient evidence to find that the press was defective in light of reasonable consumer expectations of the time.[2]

We also reject the Robinsons' assertion that the failure to warn purchasers of the dangers of manually operating a press with an automatic feeder rendered the press defective. South Dakota law does not require a manufacturer to provide a warning when the product's danger is open and obvious. *Brech v. J.C. Penney Co., Inc.*, 698 F.2d 332, 335 (8th Cir. 1983); *see also Berg v. Sukup Mfg. Co.*, 355 N.W.2d 833, 836-

---

[2]It is unclear whether South Dakota has adopted, or would adopt, the so-called "risk-utility test," in addition to the consumer expectations test of section 402A, for determining the existence of a defective condition. *Cf. First Premier Bank v. Kolcraft Enters., Inc.*, 686 N.W.2d 430, 444-45 (S.D. 2004); *Peterson v. Safway Steel Scaffolds Co.*, 400 N.W.2d 909, 913 (S.D. 1987); Restatement (Third) of Torts: Product Liability § 2(b). To the extent that the risk-utility test is an available theory, the conclusory assertions of the Robinsons' expert – that "it was technologically and economically feasible in 1939 to design a platen press with point of operation guarding," and that "a guard could have been designed in 1939 so it would not interfere when the mechanical feeder was used" – are not sufficient to create a submissible case. The record includes no evidence concerning the cost of designing a detachable platen guard in 1940, the likely effect of such a feature on the price of a press in 1940, or the likely effect of an increase in price on marketability of the press. Nor is there evidence that would shed light on the overall utility of such a design, such as the frequency with which operators in 1940 would make manual use of a press with an automatic feeder, or the number of injuries incurred as a result of any such use.

37 (S.D. 1984). The danger of placing one's hand between two massive and converging metal surfaces is sufficiently obvious that no warning is necessary. The hazard was "well known" in the industry in the early twentieth century, (Robinson App. 156), and Janet Davidson of Clark Printing testified that "anybody would know" that the platen and bed were "coming together with force and pressure, and that somebody's hand was going in between it when it was coming to and from." (*Id*. at 179). There is no evidence that other manufacturers of presses with automatic feeders provided similar warnings to customers in the 1930s and 1940s, and we see no evidentiary basis to find that consumers would have expected a warning from this open and obvious danger. We thus conclude that the absence of a warning cannot establish that the press was in a defective condition when B&K sold it.

The Robinsons also appeal the district court's grant of summary judgment on their negligence claims. They allege that B&K designed the press negligently and was negligent in failing to warn users that operating the press manually could be dangerous. Because these allegations were the basis of the Robinsons' strict liability claims, our conclusion that the product was not defective in 1940 necessitates a finding that B&K did not act negligently in 1940. Without valid strict liability claims, the Robinsons' negligence claims necessarily fail. *See* Restatement (Third) of Torts: Products Liability § 2 cmt. n; *Sexton*, 926 F.2d at 335 ("[W]hen a product liability claim is based on a design defect, the articulation of liability, whether based on a negligent breach of a duty of care or on strict liability, reduces to the single question of whether the product was defective."). If the product's design did not render it unreasonably dangerous, B&K cannot be said to have designed the product negligently. Similarly, B & K's failure to warn cannot be negligent where it does not render the product "unreasonably dangerous" relative to consumer expectations of the time.

The Robinsons next argue that B&K was negligent in failing to warn Clark Printing in the 1990s of the risk of operating the press manually. This claim relies on

South Dakota law providing a remedy for a negligent post-sale failure to warn. In *Novak v. Navistar Int'l Trans. Corp.*, 46 F.3d 844, 850 (8th Cir. 1995), we held that South Dakota law permitted recovery under this theory of liability. *See also* Restatement (Third) of Torts: Products Liability § 10 (1998). The district court nonetheless rejected the Robinsons' claim, because the court concluded that B&K had undertaken a substantial warning campaign and that, in any event, there was no duty to warn Clark Printing under these circumstances.

We agree with the district court that B&K did not breach a post-sale duty to warn in this case. B&K had sold the press in 1940 to a newspaper in Deadwood, South Dakota, over fifty years before Clark Printing came into possession of the press. Given the passage of time, it would be unreasonable to require B&K to identify all owners of its platen presses. Liability for a post-sale failure to warn requires a finding "that product sellers can practically and efficiently discharge such an obligation and that the risks of harm are sufficiently great to justify what is typically a substantial post-sale undertaking." *Id.*, cmt. a. Sales records from the 1940s would have been of little help to B&K in identifying owners of its presses in 2001. By the time the current owner acquired the press, Clark Printing was a "member of a universe too diffuse and too large for manufacturers or sellers of original equipment to identify." *Lewis v. Ariens Co.*, 751 N.E.2d 862, 867 (Mass. 2001) (internal quotation omitted). In this case, moreover, there is undisputed evidence that B&K did undertake a post-sale warning campaign, (B&K App., Ex. 1, at 14-15), and that the owner of Clark Printing, as well as the previous owner of the press, received actual notice of the warning. (Robinson App. 137-38). Whatever the scope of the post-sale duty to warn, it does not extend to warning each individual employee of a company that owns a press some sixty-one years after the sale. Accordingly, the district court correctly dismissed this claim.

The Robinsons' claims for loss of consortium and punitive damages are derivative in nature. *Budahl v. Gordon & David Assocs.*, 287 N.W.2d 489, 493 (S.D.

1980) (claim for loss of consortium "depends on the validity of the main claim"); *Risse v. Meeks*, 585 N.W.2d 875, 883 (S.D. 1998) ("[A] claim for punitive damages must be based on some underlying cause of action, since, as a general rule, there is no separate and distinct cause of action for exemplary damages.") (internal quotation omitted).  Because the district court correctly dismissed the underlying substantive claims, it properly dismissed these claims as well.

*     *     *

For these reasons, the judgment of the district court is affirmed.

_____