# IN THE SUPREME COURT OF IOWA

No. 10–1932

Filed February 3, 2012

**MITCHELL COUNTY,**

Appellee,

vs.

**MATTHEW HOOVER ZIMMERMAN,**

Appellant.

Appeal from the Iowa District Court for Mitchell County, Bryan H. McKinley, Judge.

The defendant seeks discretionary review of a district court ruling affirming the denial of his motion to dismiss a citation for violation of a Mitchell County road protection ordinance. **REVERSED AND REMANDED**.

Colin C. Murphy, Mason City, for appellant.

Mark L. Walk, Mitchell County Attorney, Osage, for appellee.

**MANSFIELD, Justice**.

Members of the Old Order Groffdale Conference Mennonite Church are forbidden from driving tractors unless their wheels are equipped with steel cleats. A Mitchell County road protection ordinance forbids driving such vehicles on the highways. The question we must decide is whether the ordinance violates the religious rights of these church members under either the United States or the Iowa Constitution.

Although the issue is a close one, we conclude the ordinance as applied to church members violates the Free Exercise Clause of the First Amendment of the United States Constitution.[1] For the reasons stated herein, we find the ordinance is not of general applicability because it contains exemptions that are inconsistent with its stated purpose of protecting Mitchell County's roads. We also find the ordinance does not survive strict scrutiny because it is not the least restrictive means of serving what is claimed to be a compelling governmental interest in road protection. We therefore reverse and remand for entry of an order of dismissal.

## I. Facts and Procedural History.

On February 1, 2010, Matthew Zimmerman was cited for operating a Massey Ferguson tractor in violation of a Mitchell County road protection ordinance. The tractor had steel cleats or "lugs" on its wheels. The lugs, which comprise "the bar that makes contact with the highway as the tractor moves forward," were several inches long and approximately an inch wide, and were attached to a rubber belt mounted on the wheel.

---

[1] We do not reach the question whether the ordinance violates the Iowa Constitution.

The ordinance in question was adopted by Mitchell County in September 2009. Its stated purpose is "to protect Mitchell County hard surfaced roads." The ordinance provides:

> No person shall drive over the hard surfaced roadways, including but not limited to cement, concrete and blacktop roads, of Mitchell County, or any political subdivision thereof, a tractor or vehicle equipped with steel or metal tires equipped with cleats, ice picks, studs, spikes, chains or other projections of any kind or steel or metal wheels equipped with cleats, ice picks, studs, spikes, chains, or other projections of any kind.

Mitchell County, Iowa, Mitchell Cnty. Road Prot. Ordinance (Sept. 22, 2009).

Zimmerman moved to dismiss the citation on the ground that his constitutional rights to free exercise of religion under the First Amendment to the United States Constitution and article I section 3 of the Iowa Constitution had been violated. A hearing was held before a magistrate, who found Zimmerman guilty of violating the ordinance and denied the motion. Zimmerman appealed the ruling to the district court. Because no recording of the hearing before the magistrate was available, a new hearing was held.

Eli Zimmerman, a fellow member of the Old Order Groffdale Conference Mennonite Church, testified at the district court hearing in support of the motion to dismiss. He explained the use of steel wheels is a religious practice and a church rule of the Old Order of Groffdale Mennonite Conference. Zimmerman cited Romans 12:2 as the biblical passage from which the rule derives.[2] The practice of using steel wheels

---

[2]According to the King James Bible, this passage reads:

*And be not conformed to this world*: but be ye transformed by the renewing of your mind, that ye may prove what is that good, and acceptable, and perfect, will of God.

on tractors dates back at least forty years. The church determined farm tractors could be used in addition to the traditional horse and buggy, but would have to be refitted with steel wheels to maintain small-scale farming and a close-knit community. If a church member drove a tractor that did not have steel wheels, he or she would be barred from the church. The steel wheel rule helps insure that tractors are not used for pleasure purposes and thereby displace the horse and buggy.

Zimmerman testified that it is permissible for church members to hire other persons to drive them for business purposes in vehicles with rubber tires. Also, a church member could hire someone with a rubber-tired tractor to haul his or her farm wagons to market.[3] However, this leads to "a lot of inconveniences." In addition, a church member could use horses for hauling purposes, if it were possible to make a living doing so. In short, it has long been a religious requirement of the Old Order of Groffdale Mennonite Conference that any motorized tractor driven by a church member be equipped with steel wheels. According to Zimmerman, "The religious practice, it has to be steel hitting the surface, [be] it soil, [be] it highway, [be] it concrete."

The prohibition on driving motorized vehicles with rubber tires is not the only church rule affecting modern conveniences. Zimmerman testified that the use of radio, television, and computers is also forbidden in his religious community.

---

*Romans* 12:2 (King James) (emphasis added). The New American Standard Version translates this passage as follows:

> *And do not be conformed to this world,* but be transformed by the renewing of your mind, so that you may prove what the will of God is, that which is good and acceptable and perfect.

*Romans* 12:2 (New American Standard) (emphasis added).

[3]The wagons may have rubber tires because people do not ride on them.

Over the years, to minimize possible road damage, the steel cleats and lugs have been made wider and have been mounted on rubber belts to provide cushioning. In Mitchell County, the Mennonites use county roads mainly when they need to haul their produce to the produce market. Both parties conceded that for some time the Mennonites and the County had peacefully coexisted, and the County did not object to the Mennonites' use of steel wheels. However, in 2009, the County embarked on a $9 million road resurfacing project, where the existing roads were "white-topped," or covered with concrete. The County had never used this new method of repaving before.

Two Mitchell County officials testified at the hearing that the steel wheels have damaged their newly white-topped roads by causing cracks and taking paint off them. Photos introduced by the County showed some cracks as well as markings where the steel wheels had come into contact with the road surface. As explained by the county engineer, "Because the steel is harder than the aggregates in that material—in the concrete surfaces and the asphalt surfaces, . . . it will wear that surface off."[4]

Accordingly, in September 2009, the County adopted its road protection ordinance. The ordinance provides that violators are subject to a maximum fine of $500 or 30 days in jail, or both, and a civil penalty may also be imposed "equal to the amount necessary to repair the damage to the road."

Under existing state law, no tire on a vehicle moved on a highway is allowed to have "any block, stud, flange, cleat, or spike or any other protuberances of any material other than rubber," except for:

---

[4]Zimmerman maintained that the steel lugs only caused "white marks" that "disappear[] as soon as it rains a little bit."

> 1. Farm machinery with tires having protuberances which will not injure the highway.
>
> 2. Tire chains of reasonable proportions upon any vehicle when required for safety because of snow, ice, or other conditions tending to cause a vehicle to skid.
>
> 3. Pneumatic tires with inserted ice grips or tire studs projecting not more than one-sixteenth inch beyond the tread of the traction surface of the tire upon any vehicle from November 1 of each year to April 1 of the following year, except that a school bus and fire department emergency apparatus may use such tires at any time.

Iowa Code § 321.442 (2009). However, a Mitchell County supervisor testified that "the penalty there is only a $10 fine, which . . . isn't prohibitive really, . . . so we enacted . . . this ordinance to protect our roads." The County concedes that its ordinance, which expressly states "Iowa Code § 321.442 shall continue to remain in full force and effect," is intended to mirror the Iowa Code provision substantively, while imposing a stiffer sanction for violations. Mitchell Cnty. Road Prot. Ordinance.

The district court overruled Matthew Zimmerman's motion to dismiss. It found "the use of steel wheels on tractors is a matter of religious conviction for members of the GC church." It also determined that the Mitchell County ordinance

> substantially burdens this religious practice. . . . These tractors are used to do field work, transport grain and produce to market, and are shared amongst neighbors and family members. All of these activities require that the tractors be driven on hard surfaced county roads. While it is admitted that other practices could be adopted to accomplish these same tasks, this ordinance will substantially burden the Mennonites . . . by requiring them to find other modes of transporting both their goods to market and their tractors to fields.

However, the court held the Mitchell County ordinance was both neutral and generally applicable. It was not motivated by religious animosity but "to protect Mitchell County's investment in resurfacing

their roads," and "it treats secular and religious conduct equally." The court therefore sustained the ordinance against Zimmerman's First Amendment challenge, citing *Employment Division, Department of Human Resources of Oregon v. Smith,* 494 U.S. 872, 110 S. Ct. 1595, 108 L. Ed. 2d 876 (1990).[5]

The district court then turned to Zimmerman's arguments based on article I section 3 of the Iowa Constitution. The court held that even if, hypothetically, that provision required the ordinance to be supported by a compelling state interest, such an interest had been established here. As the court stated, "protecting the integrity of the county's roads" from damage is a compelling state interest, and the ordinance is "the least restrictive means" because it only disallows steel wheeled vehicles "on the hard surfaced roads."

We granted Zimmerman's application for discretionary review.

**II. Standard of Review.**

We review constitutional claims de novo. *Zaber v. City of Dubuque,* 789 N.W.2d 634, 636 (Iowa 2010).

**III. The First Amendment Claim.**

Zimmerman contends the district court erred in denying his motion to dismiss based on the First Amendment to the United States Constitution. The First Amendment provides:

---

[5]Congress enacted the Religious Freedom Restoration Act of 1993 (RFRA) in response to the Supreme Court's ruling in *Smith.* Pub. L. No. 103-141, 107 Stat. 1488. Under RFRA, "[g]overnment shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability" unless the government "demonstrates that application of the burden to the person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that . . . interest." 42 U.S.C. § 2000bb–1 (2006). In *City of Boerne v. Flores*, the Supreme Court held RFRA unconstitutional as applied to the states. 521 U.S. 507, 536, 117 S. Ct. 2157, 2172, 138 L. Ed. 2d 624, 649 (1997).

>Congress shall make no law respecting an establishment of religion, or *prohibiting the free exercise thereof*; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assembly, and to petition the Government for a redress of grievances.

U.S. Const. amend. I (emphasis added). The highlighted language, the Free Exercise Clause, was part of the original Federal Bill of Rights and was made applicable to the states through the Fourteenth Amendment in *Cantwell v. Connecticut.* 310 U.S. 296, 303, 60 S. Ct. 900, 903, 84 L. Ed. 1213, 1217–18 (1940).

In America, one has "the right to believe and profess whatever religious doctrine one desires." *Smith,* 494 U.S. at 877, 110 S. Ct. at 1599, 108 L. Ed. 2d at 884. Yet the Free Exercise Clause does not guarantee the government's absolute noninterference with religion.

Two landmark cases under the Free Exercise Clause were *Sherbert v. Verner*, 374 U.S. 398, 83 S. Ct. 1790, 10 L. Ed. 2d 965 (1963), and *Wisconsin v. Yoder*, 406 U.S. 205, 92 S. Ct. 1526, 32 L. Ed. 2d 15 (1972). In *Sherbert*, the United States Supreme Court held that a Seventh Day Adventist could not be denied unemployment benefits because she refused to work on Saturday for religious reasons. 374 U.S. at 409–10, 83 S. Ct. at 1797, 10 L. Ed. 2d at 973–74. The Court found a substantial burden on the free exercise of her religion because the appellant was "force[d] to choose between following the precepts of her religion and forfeiting benefits, on the one hand, and abandoning one of the precepts of her religion in order to accept work, on the other hand." *Id.* at 404, 83 S. Ct. at 1794, 10 L. Ed. 2d at 970. The Court then turned to whether "some compelling state interest" justified this "substantial infringement of appellant's First Amendment right" and found none. *Id.* at 406–07, 83 S. Ct. at 1795, 10 L. Ed. 2d at 972. Therefore, the Court concluded, "South Carolina may not constitutionally apply the eligibility

provisions so as to constrain a worker to abandon his religious convictions respecting the day of rest." *Id.* at 410, 83 S. Ct. at 1797, 10 L. Ed. 2d at 974.

In *Yoder*, the Court decided that Wisconsin's compulsory school attendance law could not be applied to members of the Old Order Amish religion whose religion forbids school attendance after the eighth grade. 406 U.S. at 207–08, 234, 92 S. Ct. at 1529–30, 1542, 32 L. Ed. 2d at 20–21, 36. The Supreme Court seemed to say that government could not compel conduct that interferes with the practice of a legitimate religious belief except based upon "interests of the highest order." *Id.* at 214–15, 92 S. Ct. at 1533, 32 L. Ed. 2d at 24–25. Ultimately, it rejected the state's contention that "its interest in its system of compulsory education is so compelling that even the established religious practices of the Amish must give way." *Id.* at 221, 92 S. Ct. at 1536, 32 L. Ed. 2d at 28.

A decade later, however, the Supreme Court observed that when a citizen engages in a commercial activity, it may not be possible for him or her to avoid, on religious grounds, the effects of laws regulating that activity:

> Congress and the courts have been sensitive to the needs flowing from the Free Exercise Clause, but every person cannot be shielded from all the burdens incident to exercising every aspect of the right to practice religious beliefs. When followers of a particular sect enter into commercial activity as a matter of choice, the limits they accept on their own conduct as a matter of conscience and faith are not to be superimposed on the statutory schemes which are binding on others in that activity.

*United States v. Lee*, 455 U.S. 252, 261, 102 S. Ct. 1051, 1057, 71 L. Ed. 2d 127, 134–35 (1982), *superseded by statute on other grounds*, Exemption Act of 1988, Pub. L. No. 100–647, Title VIII, § 8007(a)(1), 102 Stat. 3781.

In *Lee*, a member of the Old Order Amish objected to the payment of employer Social Security taxes. He maintained that his faith already imposed an obligation on members to provide for fellow members. Both payment and receipt of Social Security benefits, he contended, were religiously forbidden. The Supreme Court did not dispute these points. *Id.* at 257, 102 S. Ct. at 1055, 71 L. Ed. 2d at 132. It acknowledged, rather, that there was a conflict between the Amish faith and the requirements of the Social Security system. But the Court cited "the broad public interest in maintaining a sound tax system" and found it would be difficult to "accommodate the comprehensive social security system with myriad exceptions flowing from a wide variety of religious beliefs." *Id.* at 259–60, 102 S. Ct. at 1056–57, 71 L. Ed. 2d at 134. "The tax imposed on employers to support the social security system must be uniformly applicable to all, except as Congress provides explicitly otherwise." *Id.* at 261, 102 S. Ct. at 1057, 71 L. Ed. 2d at 135. Hence, the Court rejected Lee's free exercise claim.

This case arguably bears some similarities to *Lee*. The tenets of Zimmerman's religion require him to engage in a commercial activity, i.e., hauling farm products, on a different basis from others. But the highways belong to everyone, and there is a public interest in preserving and protecting those highways.

Eight years after *Lee*, in *Smith*, the Supreme Court made clear that the First Amendment's Free Exercise Clause does not prohibit a state from enforcing "a neutral, generally applicable regulatory law," and cited *Lee* as its "most recent decision" involving such a law. *Smith*, 494 U.S. at 878–80, 110 S. Ct. at 1600–01, 108 L. Ed. 2d at 885–86. A regulatory law that is both neutral and generally applicable passes constitutional muster under the *Smith* line of authority, even though it may require

performance of an act—or abstention from conduct—in contradiction to an individual's religious beliefs. *Id.*[6] *Smith* distinguished *Yoder* on the ground it was not purely a free exercise case but involved an additional right—"the right of parents . . . to direct the education of their children." *Id.* at 881, 110 S. Ct. at 1601, 108 L. Ed. 2d at 887. *Smith* distinguished *Sherbert* as an unemployment case. *Id.* at 882–84, 110 S. Ct. at 1602–03,108 L. Ed. 2d at 888–89.

On the other hand, laws that are not neutral or of general applicability require heightened scrutiny. They "must be justified by a compelling governmental interest and must be narrowly tailored to advance that interest." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531–32, 113 S. Ct. 2217, 2226, 124 L. Ed. 2d 472, 489 (1993).

*Smith* and *Lukumi* illustrate the two poles of Federal Free Exercise Clause analysis. In *Smith*, the individuals were denied unemployment benefits because they had been fired for using peyote, in violation of a neutral and generally applicable regulatory law. 494 U.S. at 874–76, 110 S. Ct. at 1597–98, 108 L. Ed. 2d at 882–84. The Supreme Court found no violation of their free exercise rights. *Id.* at 886–87, 110 S. Ct. at 1604, 108 L. Ed. 2d at 890–91. By contrast, in *Lukumi*, the church challenged ordinances that targeted the killing of animals for "sacrifice" but not for food. 508 U.S. at 527–28, 113 S. Ct. at 2223–24, 124 L. Ed. 2d at 486–87. The Supreme Court concluded that "each of Hialeah's ordinances pursues the city's governmental interests only against conduct motivated by religious belief," *id.* at 545, 113 S. Ct. at

---

[6]We applied *Smith* in *Planned Parenthood of Mid-Iowa v. Maki*, 478 N.W.2d 637, 640 (Iowa 1991) (holding an injunction against a trespassing protester did not violate the protester's free exercise rights).

2233, 124 L. Ed. 2d at 498, applied strict scrutiny, and found the ordinances did not pass a strict scrutiny test, *id.* at 546–47, 113 S. Ct. at 2233–34, 124 L. Ed. 2d at 498–99. Mitchell County argues that its ordinance is a neutral and generally applicable regulatory law and, therefore, *Smith* is the more relevant precedent.[7]

In *Smith*, the Supreme Court did not define general applicability or expressly distinguish it from neutrality, but merely referenced "neutral law of general applicability" and "neutral, generally applicable law" as valid limits on free exercise. 494 U.S. at 880–81, 110 S. Ct. at 1600–01, 108 L. Ed. 2d at 886–87. *Smith* did not explore the details of general applicability because it dealt with a uniformly applicable law that contained no exemptions.[8] *Lukumi* provided some clarification of the contours of general applicability but, because of the extreme degree of gerrymandering involved, did not provide sufficient specificity to guide lower courts in cases where fewer exemptions are allowed. *See Lukumi*, 508 U.S. at 543, 113 S. Ct. at 2232, 124 L. Ed. 2d at 497 ("In this case we need not define with precision the standard used to evaluate whether a prohibition is of general application, for these ordinances fall well below the minimum standard necessary to protect First Amendment rights.").[9]

---

[7]The County also argues that the use of steel wheels is a "rule" rather than a "religious belief or practice." We disagree. Eli Zimmerman testified that the use of steel wheels is a longstanding church requirement and that someone who does not follow that precept "will be barred from the church." *See Lukumi*, 508 U.S. at 531, 113 S. Ct. at 2225, 124 L. Ed. 2d at 489 (observing that " 'religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection' ") (quoting *Thomas v. Review Bd. of Ind. Emp't Sec. Div.*, 450 U.S. 707, 714, 101 S. Ct. 1425, 1430, 67 L. Ed. 2d 624, 631 (1981))).

[8]The Oregon law at issue was a criminal law forbidding possession of a controlled substance unless prescribed by a medical practitioner. *Smith*, 494 U.S. at 874, 110 S. Ct. at 1597, 108 L. Ed. 2d at 882.

[9]Hialeah enacted a series of ordinances with a long list of carefully crafted exemptions that allowed for just about every conceivable secular form of animal killing while precluding similar activity in a religious context. *See Lukumi*, 508 U.S. at 535–37, 113 S. Ct. at 2227–29, 124 L. Ed. 2d at 491–93. Collectively these ordinances "f[e]ll

*Lukumi* did make clear that although neutrality and general applicability were overlapping concepts they were nevertheless distinct, and therefore a law could fail the separate test of general application even if it satisfied the neutrality criteria. *See id.* at 542, 113 S. Ct. at 2231–32, 124 L. Ed. 2d at 496 (referring to general applicability as a "second requirement of the Free Exercise Clause" and devoting Section IIB of the opinion to a separate analysis of this issue). *Lukumi* separated the neutrality and general applicability criteria which in *Smith* were loosely treated as a single inquiry. Still, the *Lukumi* Court recognized the two requirements were "interrelated," and "failure to satisfy one requirement is a likely indication that the other has not been satisfied." *Id.* at 531, 113 S. Ct. at 2226, 124 L. Ed. 2d at 489.

**A. Facial Neutrality.** We must first determine whether the ordinance is facially neutral. The most basic requirement of neutrality is "that a law not discriminate on its face." *Id.* at 533, 113 S. Ct. at 2227, 124 L. Ed. 2d at 491. "A law lacks facial neutrality if it refers to a religious practice without a secular meaning discernable from the language or context." *Id.* Here the ordinance reads as follows:

> No person shall drive over the hard surfaced roadways, including but not limited to cement, concrete and blacktop roads, of Mitchell County, or any political subdivision thereof, a tractor or vehicle equipped with steel or metal tires equipped with cleats, ice picks, studs, spikes, chains or other projections of any kind or steel or metal wheels equipped with cleats, ice picks, studs, spikes, chains or other projections of any kind.

Mitchell Cnty. Road Prot. Ordinance. The ordinance's language is devoid of any religious references. Furthermore, Mitchell County gave the ordinance the official title of the "Mitchell County *Road Protection*

_____

well below the minimum standard" required by the Free Exercise Clause. *Id.* at 543, 113 S. Ct. at 2232, 124 L. Ed. 2d at 497.

Ordinance." *Id.* (emphasis added). Moreover, the first section of the ordinance, entitled "Purpose," states:

> The *purpose* of this ordinance is *to protect Mitchell County hard surfaced roads*, including but not limited to cement, concrete and blacktop roads, from damage caused by a tractor, vehicle or implement equipped with steel or metal tires equipped with cleats, ice picks, studs, spikes, chains or other projections of any kind or steel or metal wheels equipped with cleats, ice picks, studs, spikes, chains or other projections of any kind.

(emphasis added). Thus, we agree with the district court that "[t]he language of the statute refers to the use of steel wheels in a secular and nonreligious context." Therefore, the ordinance is facially neutral.

**B. Operational Neutrality.** Our next inquiry is whether the ordinance is operationally neutral. Because the Supreme Court has recognized that "[f]acial neutrality is not determinative," we must examine the ordinance for "governmental hostility which is masked, as well as overt." *Lukumi*, 508 U.S. at 534, 113 S. Ct. at 2227, 124 L. Ed. 2d at 491 (recognizing that "[o]fficial action that targets religious conduct for distinctive treatment cannot be shielded by mere compliance with the requirement of facial neutrality"). We look beyond the language of the ordinance to determine whether there is "impermissible targeting" of the Old Order of Groffdale Mennonite Conference. *Id.* at 535, 113 S. Ct. at 2228, 124 L. Ed. 2d at 491–92 (referring to a " 'religious gerrymander' " (citation omitted)). In other words, we ask whether "religious practice is being singled out for discriminatory treatment." *See id.* at 538, 113 S. Ct. at 2229, 124 L. Ed. 2d at 493.

We agree with the district court that religious practice is not being intentionally discriminated against. The record supports the district court's conclusion that Mitchell County enacted the ordinance, not to persecute members of a particular faith, but to protect its $9 million

investment in newly repaved roads. The ordinance was passed by Mitchell County only after its engineers detected apparent damage caused to the roads by steel wheels. That damage had not occurred prior to 2009 because the repaving project that year was the first time the "white-topping" method had been used by the County. Moreover, the prohibitions of the ordinance essentially buttress existing state law requirements. *See* Iowa Code § 321.442.

At the same time, we must recognize the ordinance was adopted specifically to address use of the resurfaced concrete roads by steel wheel tractors. This is not a case where new activity brushed up against a preexisting ordinance, but where an ordinance was passed to deal with a longstanding religious practice. *See Yoder,* 406 U.S. at 219, 226, 235, 92 S. Ct. at 1535, 1538, 1543, 32 L. Ed. 2d at 27, 31, 36 (noting that "[t]he requirement for compulsory education beyond the eighth grade is a relatively recent development in our history," whereas the Old Order Amish faith has a "history of three centuries").

**C. General Applicability.** We now turn to the more difficult question whether the ordinance is "generally applicable." *Lukumi* found that Hialeah's ordinances violated the principle of general applicability because "the secular ends asserted in defense of the laws were pursued only with respect to conduct motivated by religious beliefs." 508 U.S. at 524, 113 S. Ct. at 2222, 124 L. Ed. 2d at 484. The Court further made clear that an ordinance could violate the principle of general applicability even if religious conduct were not the only activity it prohibited, so long as religious adherents ultimately bore most of the burden of compliance. *See id.* at 535–37, 113 S. Ct. at 2228–29, 124 L. Ed. 2d at 492–93 (noting that "almost the only conduct subject to Ordinances . . . is the religious exercise" and "[t]he net result of the gerrymander is that few if

any killings of animals are prohibited other than Santeria sacrifice" while "most other killings fall outside the prohibition"). The Court emphasized that Hialeah's ordinances imposed restrictions on Santeria worshippers the city was not willing to impose in other contexts, noting that this was the "precise evil . . . the requirement of general applicability is designed to prevent." *Id.* at 545–46, 113 S. Ct. at 2233, 124 L. Ed. 2d at 498. The Court objected to Hialeah's "devalu[ation of] religious reasons . . . by judging them to be of lesser import than nonreligious reasons." *Id.* at 537, 113 S. Ct. at 2229, 124 L. Ed. 2d at 493. It recognized that although "[a]ll laws are selective to some extent, . . . categories of selection are of paramount concern when a law has the incidental effect of burdening religious practice." *Id.* at 542, 113 S. Ct. at 2232, 124 L. Ed. 2d at 496.

The *Lukumi* Court found that the Hialeah ordinances were underinclusive in terms of serving the purposes they were designed for—protecting public health and preventing cruelty to animals—in that they "fail[ed] to prohibit nonreligious conduct that endangers these interests in a similar or greater degree than Santeria sacrifice does." *Id.* at 543, 113 S. Ct. at 2232, 124 L. Ed. 2d at 497. This underinclusion was held to be substantial because the overwhelming majority of activity that the ordinances targeted was religious. *See id.* Two types of underinclusiveness were identified: (1) secular activities that equally threatened the purposes of the ordinances but were not prohibited (and therefore were approved by silence), and (2) some equally deleterious secular activities that were granted express approval. *See id.*

Thus, according to *Lukumi,* the Free Exercise Clause appears to forbid the situation where the government accommodates secular interests while denying accommodation for comparable religious

interests. Hialeah could not constitutionally treat religious sacrifice as less worthy of protection than secular animal killings that posed the same type and degree of potential harm.

*Smith* dealt with a law containing no exemptions. The ordinances in *Lukumi* had a wide array of exemptions. Because there has been no subsequent word from the Supreme Court on the meaning of "general applicability," other courts have had to wrestle with its definition in specific cases.[10] *Lukumi* tells us that underinclusion is problematic when it is "substantial, not inconsequential." *Id.* Other courts have had to refine the meaning of these rather general terms.

One prominent discussion of general applicability was authored by Supreme Court Justice Alito when he served on the Third Circuit. *See Fraternal Order of Police Newark Lodge v. City of Newark*, 170 F.3d 359 (3d Cir. 1999). In *Fraternal Order,* Sunni Muslim police officers refused to comply with department regulations requiring them to shave their beards for the purpose of establishing uniform appearance to the public and morale within the police force. *Id.* at 366. This regulation did not allow for a religious exemption but did permit two secular exemptions, one for a very limited number of officers who could not shave for medical reasons and one for undercover officers. *Id.* at 360. The court found the undercover exemption did not undermine the purpose of the rule and therefore did not impact its general applicability. *Id.* at 366. However, the secular medical exemption was considered sufficiently parallel to the requested religious exemption such that if the former were

_____

[10]In *Locke v. Davey*, 540 U.S. 712, 124 S. Ct. 1307, 158 L. Ed. 2d 1 (2004), the Supreme Court upheld the State of Washington's failure to make state scholarship aid available for students pursuing theology degrees. The Court held the *Lukumi* line of cases was inapplicable because the state simply had made a decision not to fund certain activity and imposed "neither criminal nor civil sanctions on any type of religious service or rite." *Locke*, 540 U.S. at 720, 124 S. Ct. at 1312, 158 L. Ed. 2d at 9.

accommodated, the latter must also be in order to maintain general applicability. *Id.* at 364–66. The City of Newark was not able to explain why "religious exemptions threaten important city interests but medical exemptions do not." *Id.* at 367. Therefore, heightened scrutiny applied and the city was required to grant the requested religious accommodation.[11]

The Third Circuit followed a two-step analysis to evaluate the potential underinclusiveness or nongenerality of the challenged ordinance. It first identified the governmental purposes that the ordinance was designed to promote or protect and then asked whether it exempted or left unregulated any type of secular conduct that threatened those purposes as much as the religious conduct that had been prohibited. *Id.* at 366–67. If a law allowed secular conduct to undermine its purposes, then it could not forbid religiously motivated conduct that did the same because this would amount to an unconstitutional "value judgment in favor of secular motivations, but [against] religious motivations." *Id.* at 366. However, if the governmental entity could show that exempted secular conduct was sufficiently different in terms of its impact on the purpose of the law, the exemption would not render the law underinclusive. *Id.* (noting that "the Free Exercise Clause does not require the government to apply its laws to activities that it does not have an interest in preventing").

*Fraternal Order* makes it clear that not every secular exemption automatically requires a corresponding religious accommodation. The undercover police exemption did not undermine the purposes of the no-

---

[11]In a footnote, the Third Circuit noted that "*Smith* and *Lukumi* speak in terms of strict scrutiny," but it assumed that "an intermediate level of scrutiny applies since this case arose in the public employment context." *Fraternal Order*, 170 F.3d. at 366 n.7.

beard policy, and therefore, had it been the only exemption, general applicability would not have been violated and no religious accommodation would have been required (assuming that there was a rational basis behind the ordinance). Thus, the central question under *Fraternal Order* is whether the secular exemptions threaten the statutory purposes to an equal or greater degree than a religious exemption. Although there may be many secular exemptions to a statute, if none of them undermines the statutory purpose, then even their cumulative weight does not establish underinclusiveness. Yet, in *Fraternal Order*, only a single narrow health exception was held to be sufficient to establish a violation of general applicability, thus triggering heightened scrutiny, because it was deemed to threaten the secular purpose.

The Third Circuit has applied its *Fraternal Order* precedent in several subsequent decisions. In *Tenafly Eruv Ass'n v. Borough of Tenafly*, the court found that the free exercise rights of Orthodox Jews were likely violated when Tenafly prohibited them from affixing "lechis" (thin black strips designating an "eruv" where pushing and carrying is permitted on the Sabbath) to utility poles while allowing other materials such as house numbers to be affixed. 309 F.3d 144, 152, 178 (3d Cir. 2002). The exemptions undermined the borough's apparent purpose of preventing visual clutter. *Id.* at 172. In *Blackhawk v. Pennsylvania,* the court held that Pennsylvania violated the Free Exercise Clause by refusing a fee waiver to a Native American who kept a bear for ceremonial purposes when the law, among other things, categorically exempted zoos and nationally recognized circuses from such fees. 381 F.3d 202, 210–11, 214 (3d Cir. 2004) (Alito, J.). Although the state argued that exemptions could be justified because they provided a tangible benefit to Pennsylvania wildlife, the court found the challenged fee provisions

substantially "underinclusive" with respect to this alleged benefit. *Id.* at 211–12. In sum, the court concluded:

> A law fails the general applicability requirement if it burdens a category of religiously motivated conduct but exempts or does not reach a substantial category of conduct that is not religiously motivated and that undermines the purposes of the law to at least the same degree as the covered conduct that is religiously motivated.

*Id.* at 209.

The Eleventh Circuit applied similar reasoning in holding that a limited secular exemption failed the general applicability test. In *Midrash Sephardi, Inc. v. Town of Surfside,* the town passed a zoning ordinance " 'to provide for retail shopping and personal service needs of the town's residents and tourists' " with the goal of protecting "retail synergy" in the business district. 366 F.3d 1214, 1233, 1235 (11th Cir. 2004) (citation omitted). The ordinance excluded religious assemblies from the area, but an exemption was allowed for private clubs and lodges. *Id.* at 1235. The court found this policy to be underinclusive with respect to the town's goal of retail synergy because it was "pursued only against religious assemblies, but not other non-commercial assemblies, thus devaluing the religious reasons for assembling." *Id.* at 1234. Echoing the reasoning in *Fraternal Order*, the court found that these limited exceptions "violate[d] the principles of neutrality and general applicability because private clubs and lodges endanger Surfside's interest in retail synergy as much or more than churches and synagogues." *Id.* at 1235. As in *Fraternal Order*, only a single categorical secular exemption was enough to establish underinclusiveness and require heightened scrutiny.

In another case, a federal district court found a University of Nebraska policy with three categorical secular exemptions was not of general applicability and therefore subjected it to strict scrutiny which it

ultimately failed. *See Rader v. Johnston*, 924 F. Supp. 1540 (D. Neb. 1996). The university had a parietal rule for freshmen that required them to live on campus, but allowed exemptions for students who were nineteen years or older, married, or living with their parents. *Id.* at 1546. These categorical exemptions, combined with a general discretionary exemption, together covered more than one third of all freshmen. *Id.* at 1553. Nonetheless, the university refused to grant an exemption to a religious student who wanted to live off campus at a Christian Student Fellowship house because he believed that on-campus dorms were immoral and would endanger his spiritual life. *Id.* at 1544–45. This decision was found to violate Rader's free exercise rights and the university was ordered to refrain from enforcing its policy against him. *Id.* at 1558; *see also Stinemetz v. Kan. Health Policy Auth.*, 252 P.3d 141, 154–56 (Kan. Ct. App. 2011) (holding that the First Amendment Free Exercise rights of a Jehovah's Witness Medicaid beneficiary were violated when she was denied a request for an out-of-state bloodless liver transplant because, although the regulations generally did not cover out-of-state services, they allowed for individual exemptions on a case-by-case basis); *Horen v. Commonwealth*, 479 S.E.2d 553, 557 (Va. Ct. App. 1997) (finding a violation of the First Amendment Free Exercise Clause when a Native American medicine woman and her husband were convicted of illegal possession of owl feathers and the statute exempted possession of such feathers by "taxidermists, academics, researchers, museums, and educational institutions").

By contrast, federal courts have generally found laws to be neutral and generally applicable when the exceptions, even if multiple, are consistent with the law's asserted general purpose. Thus, in *Stormans, Inc. v. Selecky,* the Ninth Circuit upheld certain Washington regulations

requiring pharmacists to fill all prescriptions over a pharmacist's objection that providing the Plan B contraceptive would violate her religious beliefs. 586 F.3d 1109, 1115–17 (9th Cir. 2009), *abrogated on other grounds by Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 129 S. Ct. 365, 376, 172 L. Ed. 2d 249, 262 (2008). Although the regulations contained exemptions where the customer did not pay, supplies were limited, or the pharmacist had a legitimate belief the prescription was fraudulent, the court reasoned that these exceptions did not undermine the goal of "increasing safe and legal access to medications" and thus did not affect the general applicability of the rules. *Id.* at 1135. In *Swanson ex rel. Swanson v. Guthrie Independent School District No. I-L*, the Tenth Circuit upheld a school district policy forbidding part-time attendance even though it allowed secular exemptions for fifth-year seniors and special education students. 135 F.3d 694, 697, 701 (10th Cir. 1998). The plaintiffs there were parents who wanted their child to learn Christian principles at home but who wished to send their homeschooled daughter to the local public school part-time so she could benefit from classes such as foreign languages, music, and science that her parents felt less competent to teach. *Id.* at 696. The policy against part-time attendance applied equally to all homeschooled children, regardless of the reason for home schooling. *Id.* at 698. Although the court emphasized this last point in rejecting the plaintiffs' claim, it also noted the exemptions in the law (fifth-year seniors and special education students) were consistent with the school district's overall purpose of not taking on students for whom there was no corresponding state aid. *Id.* at 698 n.3. Because state aid was based on the number of full-time students in the district, and only the two exempted categories of part-time students were counted as full-time for

state-aid purposes, there were no exemptions for students who did not qualify for state aid, and general applicability was met. *Id*; *see also Combs v. Homer-Ctr. Sch. Dist.*, 540 F.3d 231, 242 (3d Cir. 2008) (finding a homeschooling law to be neutral and of general applicability because it imposed the same standards on everyone who was being homeschooled); *Lighthouse Inst. for Evangelism, Inc. v. City of Long Branch*, 510 F.3d 253, 266 (3d Cir. 2007) (indicating that "the relevant comparison for purposes of a Free Exercise challenge to a regulation is between its treatment of certain religious conduct and the analogous secular conduct that *has a similar impact on the regulation's aims*").[12]

With the foregoing authorities in mind, we turn to the ordinance at issue. Zimmerman contends the Mitchell County ordinance is not generally applicable because it carries over exceptions from Iowa Code section 321.442 that undermine the ordinance's purpose and demonstrate its underinclusivity.[13] The state law exemptions are as follows:

> 1. Farm machinery with tires having protuberances which will not injure the highway.

---

[12]We do not want to convey the impression that post-*Lukumi* cases are monolithic. In *Primera Iglesia Bautista Hispana of Boca Raton v. Broward County*, cited by the district court below, the Eleventh Circuit seemed to indicate that a regulation or ordinance would be considered generally applicable unless it burdened "almost only" religious uses. 450 F.3d 1295, 1309 (11th Cir. 2006). That case involved statutory interpretation of the Religious Land Use and Institutionalized Persons Act (RLUIPA). The zoning regulation there contained no exemptions. *Id.* at 1310.

[13]As noted above, the ordinance provides that "Iowa Code § 321.442 shall continue to remain in full force and effect and no provision of that Code Section shall be deemed to have been eliminated by this ordinance." Mitchell Cnty. Road Prot. Ordinance. Hence, Zimmerman argues—and the County does not dispute—that the exemptions set forth in section 321.442 are also preserved as exemptions in the Mitchell County ordinance. We need not address whether state law would preempt the ordinance if it sought to prohibit uses permitted under section 321.442. *See* Iowa Const. art. III § 38A; Iowa Code § 321.235; *City of Davenport v. Seymour*, 755 N.W.2d 533, 538–39 (Iowa 2008).

2. Tire chains of reasonable proportions upon any vehicle when required for safety because of snow, ice, or other conditions tending to cause a vehicle to skid.

3. Pneumatic tires with inserted ice grips or tire studs projecting not more than one-sixteenth inch beyond the tread of the traction surface of the tire upon any vehicle from November 1 of each year to April 1 of the following year, except that a school bus and fire department emergency apparatus may use such tires at any time.

Iowa Code § 321.442. Zimmerman asserts these exceptions "undermine the County's purpose of preventing damage to the roads."

Upon our review, we find the County's ordinance lacks sufficient general applicability to bring this case under *Smith*. Section 321.442(1) is not a problem; it exempts farm machinery tires with protuberances, but only so long as they "will not injure the highway." Such an exception is consistent with the stated purpose of protecting the County's roads.[14] One could argue that sections 321.442(2) and (3) do not defeat the general applicability of the ordinance either. Although they allow the use of tire chains, ice grips, or tire studs, the exemptions are limited in scope ("reasonable proportions," "not more than one-sixteenth inch beyond the tread of the traction surface of the tire"), and except for buses and emergency vehicles, in timing ("when required for safety because of snow, ice, or other conditions," "from November 1 of each year to April 1 of the following year"). One could construct an argument, therefore, that the ordinance really serves a *mixed* purpose: It protects the roads from damage except when necessary for safety reasons.

Yet we believe the effort ultimately fails. School buses are allowed to use ice grips and tire studs year round. It is difficult to see how this secular exemption serves either of the foregoing dual purposes.

---

[14]Although Zimmerman maintained at the hearing that the steel lugs did not harm the county's roads, he did not argue that this exemption applied.

Moreover, the County declined in September 2009 to regulate various *other* sources of road damage besides steel wheels.  Rather, it chose to prohibit only a particular source of harm to the roads that had a religious origin.  For example, although state law contains various limits on the overall weight of vehicles and also limits weight per inch of tire width, *see* Iowa Code §§ 321.440(2), .463, Mitchell County elected not to cover these matters in its ordinance.

The underinclusion of the ordinance undermines its general applicability.  *See Blackhawk*, 381 F.3d at 209 (noting that a law "fails the general applicability requirement if it burdens a category of religiously motivated conduct but exempts *or does not reach* a substantial category of conduct that is not religiously motivated and that undermines the purposes of the law to at least the same degree as the covered conduct that is religiously motivated" (emphasis added)).  We are convinced the underinclusion is "substantial, not inconsequential." *Lukumi*, 508 U.S. at 543, 113 S. Ct. at 2232, 124 L. Ed. 2d at 497.[15]

**D. Application of Strict Scrutiny**.  Of course, an ordinance can fail the general applicability test and still not amount to a Free Exercise violation.  However, the ordinance must then "undergo the most rigorous of scrutiny."  *Id.* at 546, 113 S. Ct. at 2233, 124 L. Ed. 2d at 498.  That is, it "must advance ' "interests of the highest order" ' and must be narrowly tailored in pursuit of those interests."  *Id.* (citation omitted). The County has the burden to show that the ordinance serves a compelling state interest and is the least restrictive means of attaining

---

[15]The County argues this case is unlike *Blackhawk* and *Fraternal Order* because there are no exemptions:  The ordinance "does not permit anyone to use steel wheels on the road."  But the ordinance is not directed at "steel wheels," nor could it be, if the County wanted it to be considered "neutral."  The ordinance is directed at metal projections of any kind, and it provides for exemptions.

that interest.  *See Thomas v. Review Bd. of Indiana Emp't Sec. Div.*, 450 U.S. 707, 718, 101 S. Ct. 1425, 1432, 67 L. Ed. 2d 624, 634 ("The state may justify an inroad on religious liberty by showing that it is the least restrictive means of achieving some compelling state interest.").[16]

The district court found that the County has a compelling interest "in protecting the integrity of the county's roads.  This interest not only includes the economic costs of repairing roads, but also the safety and drivability of the roads for all."  We do not decide this issue.  *See United States v. Oliver*, 255 F.3d 588, 589 (8th Cir. 2001) (recognizing a compelling governmental interest in preserving the bald eagle population despite a claim that possession of eagles was necessary to the practice of the Sioux faith); *Satawa v. Bd. of Cnty. Road Comm'rs*, 687 F. Supp. 2d 682, 699–700 (E.D. Mich. 2009) (holding that highway safety concerns amounted to a compelling state interest justifying the denial of a permit for a Nativity display on a median in the center of a major traffic artery); *but see Blackhawk*, 381 F.3d at 213–14 (stating it is "doubtful" whether "maintaining the fiscal integrity" of a permit fee system is a compelling

---

[16]Assuming without deciding that the church members must show the ordinance places a substantial burden on their religion, that requirement has been met here.  Although Eli Zimmerman testified it is "possible" to comply with the ordinance and still follow his religion, this would require the Mennonites to pursue one of two impractical alternatives: Either they would have to use horses and buggies to haul their produce to market (if they even had enough horses) or they would have to hire persons of another faith to do their hauling.  We agree with the district court's finding "from the record that the Mitchell County ordinance substantially burdens this religious practice."  *See Sherbert*, 374 U.S. at 404, 83 S. Ct. at 1794, 10 L. Ed. 2d at 970 (finding an unconstitutional burden even though South Carolina did not require the appellant to give up her Saturday Sabbath Day but merely denied her unemployment benefits because "the pressure upon her to forego that practice is unmistakable"); *see also Thomas*, 450 U.S. at 717–18, 101 S. Ct. at 1432, 67 L. Ed. 2d at 634 ("Where the state conditions receipt of an important benefit upon conduct proscribed by a religious faith, or where it denies such a benefit because of conduct mandated by religious belief, thereby putting substantial pressure on an adherent to modify his behavior and to violate his beliefs, a burden upon religion exists.  While the compulsion may be indirect, the infringement upon free exercise is nonetheless substantial.").

state interest); *United States v. Hardman,* 297 F.3d 1116, 1127 (10th Cir. 2002) (stating that "a desire for federal funds is not a compelling interest").

We are not persuaded, however, that the ordinance is narrowly tailored to achieve the stated objective of road preservation. The photographic evidence does show examples of cracking and marking that, according to the County's witnesses, resulted from the steel lugs. The county engineer testified that steel wheels hasten deterioration of the County's roads. He said that "the steel is harder than the aggregates . . . in the concrete surfaces and the asphalt surfaces, and it will wear that surface off." On the other hand, the County agreed that Mennonite tractors had driven over hard-surfaced county roads, including both concrete and asphalt roads, for years before the ordinance was enacted. The county engineer admitted that various factors lead to road deterioration,[17] and he could not quantify the impact of steel wheels on the County's normal schedule of road repair or resurfacing.[18]

Given the lack of evidence of the *degree* to which the steel lugs harm the County's roads, the undisputed fact that other events cause road damage, and the undisputed fact that the County had tolerated steel lugs for many years before 2009, it is difficult to see that an outright ban on those lugs is necessary to serve a compelling state interest. A more narrowly-tailored alternative might allow steel wheels on county roads in some circumstances, while establishing an effective mechanism for recouping the costs of any necessary road repairs if

---

[17]For example, he admitted that one of the newly white-topped roads has experienced longitudinal cracking even though no steel wheels have been driven on it.

[18]Although both we and the parties use the shorthand "steel wheels," the attachments are more accurately described as lugs, cleats, or slats. Eli Zimmerman testified that they have been redesigned and placed over rubber to reduce their potential to cause damage.

damage occurs.  Indeed, an adjoining county reached an agreement with the Mennonite community to accept a financial deposit in a trust arrangement to cover possible road damage, in lieu of banning steel wheels.  *See* www.co.howard.ia.us/bosinfo/minutesarchive.htm (minutes of December 7, 2009 Board of Supervisors Meeting); Jean Caspers-Simmet, *Howard County Crafts Agreement Over Steel-Wheel Tractors*, Agri News, Dec. 1, 2009, http://www.agrinews.com/howard/county/crafts/ agreement/over/steelwheel/tractors/story-1056.html.   As the United States Supreme Court has indicated in a statutory case arising under the Religious Freedom Restoration Act, the compelling interest test must focus on "the harms posed by the particular use at issue here."  *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 432–33, 126 S. Ct. 1211, 1221–22, 163 L. Ed. 2d 1017, 1032–33 (2006) (finding the compelling interest test would not sustain application of the Controlled Substances Act to approximately 130 American members of a Christian Spiritist sect who used hoasca, a tea containing a hallucinogen, for communion).

A comparison can be drawn between the present case and a series of cases that have arisen over state-law requirements for special signage on slow moving vehicles.  In *State v. Hershberger*, 444 N.W.2d 282 (Minn. 1989), *cert. granted*, *judgment vacated*, 495 U.S. 901, 110 S. Ct. 1918, 109 L. Ed. 2d 282 (1990), and *State v. Miller*, 549 N.W.2d 235 (Wis. 1996), members of the Old Order Amish faith challenged state laws that required their horse-drawn buggies to display fluorescent red and orange "slow moving vehicle" signs.

*Hershberger* was a pre-*Smith* case.  There the court applied a compelling state interest test and acknowledged for purposes of the case that highway safety was a compelling interest, but invalidated the sign requirement after concluding that the use of silver reflective tape and

lighted red lanterns, as proposed by the church members, would adequately address the same safety concerns. *Hershberger*, 444 N.W.2d at 288–89. In *Miller*, interpreting the Wisconsin Constitution rather than the United States Constitution, the court also applied a compelling state interest test. Similar to the Minnesota court, the Wisconsin court concluded that "the State has failed to demonstrate that public safety on the highways cannot be served by the Respondents' proposed less restrictive alternative of the white reflective tape and the red lantern." *Miller*, 549 N.W.2d at 242.

While the analogy between those cases and the present steel wheels case is not a perfect one, the same basic analytical framework applies here. The question here is whether the County's goal of road preservation can be accomplished less restrictively without banning the tractors used by the Mennonites. On this record, we believe it can be. We therefore hold that the application of the Mitchell County road protection ordinance to Matthew Zimmerman violates his rights of free exercise of religion under the First Amendment to the United States Constitution. We need not and do not reach the question whether Zimmerman's rights under article I section 3 of the Iowa Constitution have also been violated.

### IV. Conclusion.

Cases involving religious rights present challenging issues. Here, a conflict has arisen between longstanding religious practice and a county's legitimate desire to protect its investment in roads. On this record, we find the religious rights prevail.

We reverse and remand to the district court for entry of an order of dismissal.

**REVERSED AND REMANDED**.