#27348, #27362-a-SLZ

**2016 S.D. 35**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

RICHARD KARST and SUSAN KARST,          Plaintiffs and Appellants,

v.

SHUR-COMPANY n/k/a
SHORMA COMPANY and
WILSON TRAILER COMPANY,          Defendants and Appellees.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE FOURTH JUDICIAL CIRCUIT
CORSON COUNTY, SOUTH DAKOTA

\* \* \* \*

THE HONORABLE MICHAEL W. DAY
Judge

\* \* \* \*

G. BRYAN ULMER, III of
The Spence Firm, LLC
Jackson, Wyoming

    and

AARON D. EIESLAND of
Johnson Eiesland Law Offices, PC
Rapid City, South Dakota          Attorneys for plaintiffs
and appellants.

\* \* \* \*

ARGUED ON
DECEMBER 1, 2015

OPINION FILED **04/20/16**

JAMES A. POWER
J.G. SHULTZ of
Woods, Fuller, Shultz & Smith, PC
Sioux Falls, South Dakota

Attorneys for defendant and
appellee Shur-Company n/k/a
Shorma Company.


MITCHELL PETERSON
MELISSA C. HINTON of
Davenport, Evans, Hurwitz
 & Smith, LLP
Sioux Falls, South Dakota

Attorneys for defendant and
appellee Wilson Trailer
Company.

#27348, #27362

ZINTER, Justice

[¶1.]        Richard and Susan Karst sued Shur Company and Wilson Trailer

Company on negligence and strict-liability causes of action.[1]  Karsts alleged

defective design and improper warnings relating to Shur's electric-tarp system that

Wilson included on a grain trailer it sold to Richard.  The circuit court granted

summary judgment against Karsts on their failure-to-warn claims, and a jury found

in favor of Defendants on Karsts' remaining claims.  On appeal Karsts argue that

the circuit court erred in instructing the jury, in granting summary judgment on the

improper-warning claims, in permitting an assumption-of-risk defense to go to the

jury, and in refusing to admit evidence of the warnings that were provided.  We

affirm.

*Facts and Procedural History*

[¶2.]        Richard Karst was in the business of trucking and buying and selling

oats.  He used a type of grain trailer that required a tarp to cover the cargo area.

From 1980 until 2007, Richard used a manual-tarp system on his trailers.

[¶3.]        In 2007, Richard purchased two new grain trailers from Wilson.  Both

were equipped with Shur's model 3500 electric-tarp system.  The tarp system

featured a "roll tube" that ran the length of the trailer.  A tarp, when rolled around

the roll tube, retracted to uncover the cargo area.  The roll tube was attached to the

front and rear of the trailer by a "flex arm" at each end.  The tarp system used an

---

1.      In this opinion, Richard and Susan will be referred to individually by their
        first names or collectively as "Karsts."  Shur Company and Wilson Trailer
        Company will be referred to individually as "Shur" and "Wilson,"
        respectively, or collectively as "Defendants."

electric motor to roll up the tarp, and the tarp was unrolled to cover the trailer with the assistance of torsion springs located where the flex arms attached to the trailer. A spline at the rear end of the roll tube allowed the use of a manual crank to roll and unroll the tarp when necessary. However, a metal sleeve located at the end of the rear flex arm fit over the spline and connected the flex arm to the roll tube. Consequently, to get access to the spline to unroll the tarp manually, the flex arm had to be disconnected from the roll tube by removing the sleeve.

[¶4.] On December 15, 2009, Richard loaded two trailers with oats at an elevator in McLaughlin. The lead trailer's tarp closed properly, but the pup trailer's electric-tarp system failed, leaving the roll tube and tarp in the open position. A warning label located on the rear flex arm warned that it was under spring tension and advised reading the manual before disassembling the flex arm. Although the manual similarly warned that the flex arms were under tension, the manual did not offer guidance on how to unroll a tarp stuck in the open position with the electric-tarp system engaged.

[¶5.] Because the tarp had to be closed before leaving the elevator, Richard climbed onto a platform on the back of the trailer to attempt to manually unroll the tarp. He attempted to hold the flex arm with one hand while using a hammer to knock the flex arm's metal sleeve off the roll tube to get access to the spline. As soon as the sleeve separated from the roll tube, the torsion springs caused the flex arm to spring toward Richard, knocking him to the ground. Richard suffered a fractured skull and permanent brain damage. As a result of the brain injury, he is unable to recall the accident.

[¶6.]        Karsts later brought this suit on causes of action alleging strict liability and negligence (both for defectively designing the product and for failing to properly warn of the danger).  Wilson moved for summary judgment on all claims, and Shur moved for summary judgment on the failure-to-warn claims.  After Karsts responded to the summary judgment motions on the failure-to-warn claims, the circuit court determined that Karsts failed to produce evidence that Richard had read the provided warnings prior to the accident.  The court concluded that in the absence of such evidence, Karsts would be unable to prove causation on their failure-to-warn claims.  Consequently, the court granted summary judgment to Defendants on all failure-to-warn claims.  The court also granted summary judgment to Wilson on Karsts' negligent-defective-design claim.[2]  After a twelve-day trial, a jury returned a verdict in favor of Defendants on Karsts' surviving claims.

[¶7.]        Karsts appeal, raising four issues[3]:

1.    Whether Jury Instruction 20 on strict liability misstated South Dakota law and misled and confused the jury.

2.    Whether the circuit court erred in granting summary judgment in favor of Defendants on Karsts' failure-to-warn claims.

3.    Whether there was sufficient evidence to instruct the jury on assumption of the risk.

4.    Whether Karsts should have been allowed to present evidence of the warnings actually given in order to counter testimony on assumption of the risk.

---

2.    This ruling has not been appealed.

3.    By notice of review, Wilson also raised the question whether the circuit court erred in finding that Wilson was an "assembler" within the meaning of SDCL 20-9-9.  Because we affirm the circuit court's decision in all other respects, we do not reach this issue.

*Decision*

*Jury Instruction 20—Strict Liability*

[¶8.] "A trial court has discretion in the wording and arrangement of its jury instructions, and therefore we generally review a trial court's decision to grant or deny a particular instruction under the abuse of discretion standard. However, no court has discretion to give incorrect, misleading, conflicting, or confusing instructions . . . ." *Vetter v. Cam Wal Elec. Coop., Inc.*, 2006 S.D. 21, ¶ 10, 711 N.W.2d 612, 615 (citations omitted). Therefore, "when the question is whether a jury was properly instructed overall, that issue becomes a question of law reviewable de novo." *Id.*

[¶9.] Karsts argue that Instruction 20 on strict liability misstated the law and confused and misled the jury in describing products that are in a "defective condition unreasonably dangerous" to the user. Because jury instructions "must be considered as a whole in determining if error was committed in giving or refusing to give certain instructions[,]" *Degen v. Bayman*, 90 S.D. 400, 406, 241 N.W.2d 703, 706 (1976), Karsts' argument requires consideration of Instructions 19 and 20 together. This case was submitted to the jury on a defective-design theory, and the parties agreed that the strict-liability question should be determined under what is commonly referred to as the risk-utility test. Accordingly, the court gave Instruction 19, which stated: "A product is in a defective condition unreasonably dangerous to the user if it could have been designed to prevent a foreseeable harm without significantly hindering its function or increasing its price." Instruction 20 stated:

> A product can be dangerous without being unreasonably dangerous. Even if a product is defective in some manner, you must find that the defect renders the product "unreasonably" dangerous. A product is not in a defective or unreasonably dangerous condition merely because it is possible to be injured while using it.

According to Karsts, Instruction 20 was not needed because "Instruction 19 gave the jury all of the law it needed to decide whether defendants were liable on a product-defect theory." Karsts more specifically contend: (1) that under South Dakota law, Instruction 20 incorrectly implied a separate unreasonably-dangerous test, that defectiveness and unreasonable dangerousness are not separate elements, and that the jury was not required to accept *any* level of danger in this product; (2) Instruction 20 derives from Restatement (Second) of Torts § 402A comment k (Am. Law Inst. 1965), which applies only to products that are unavoidably unsafe; (3) Instruction 20 gave no standard for differentiating between a dangerous product and an unreasonably dangerous product; and (4) Instruction 20 unfairly emphasized the Defendants' theory of the case.

[¶10.]    First, Instruction 20 did not misstate South Dakota-strict-liability law. Karsts incorrectly presume that the phrase "defective condition unreasonably dangerous" is a single element that does not include an unreasonably-dangerous inquiry. This Court adopted the rule of strict liability expressed in the Restatement (Second) of Torts § 402A. *Peterson v. Safway Steel Scaffolds Co.*, 400 N.W.2d 909, 912 (S.D. 1987). Under this rule, a seller is strictly liable for physical harm caused by a product in a defective condition unreasonably dangerous to the user or consumer. Restatement (Second) of Torts § 402A. The rule "applies only where the defective condition of the product *makes it unreasonably dangerous* to the user or

consumer." *Id.* § 402A cmt. i (emphasis added). Although we have not formally

adopted the Restatement (Third) of Torts: Products Liability (Am. Law Inst. 1998),[4]

it similarly imposes strict liability for defective design "when the foreseeable risks of

harm posed by the product could have been reduced or avoided by the adoption of a

reasonable alternative design . . . , *and* the omission of the alternative design

*renders the product not reasonably safe*[.]" *Id.* § 2(b) (emphasis added). Thus, both

the Restatement (Second) and Restatement (Third) rules contemplate a causal

relationship between two elements: a defect must "make" or "render" a product

unreasonably dangerous (not reasonably safe). As we have previously said, "[s]trict

liability requires that the product be defective *and* unreasonably dangerous."

---

4.   The dissent argues that we should adopt the risk-utility balancing test from the Restatement (Third) of Torts: Products Liability § 2, cmt. f. Alternatively, the dissent argues that we should overrule *First Premier Bank v. Kolcraft Enterprises, Inc.*, 2004 S.D. 92, ¶ 29, 686 N.W.2d 430, 445, *superseded on other grounds by rule*, Supreme Court rule 06-67, *as recognized in In re Estate of Duebendorfer*, 2006 S.D. 79, ¶ 19 n.4, 721 N.W.2d 438, 444 n.4, to the extent it may be interpreted to prohibit giving both the risk-utility and consumer-expectation tests. The dissent finally suggests that another "feasible option" may be adopting the modified consumer-expectation test set forth in *Potter v. Chicago Pneumatic Tool Co.*, 694 A.2d 1319, 1330-35 (Conn. 1997). *See* Dissent ¶¶ 48-53. We agree that the *Kolcraft* language—unqualifiedly indicating that the risk-utility and consumer-expectation tests are alternative rather than cumulative requirements for proving a product is in a defective condition unreasonably dangerous—should be revisited. But that language is not germane to Karsts' assertion of error. Karsts' objection is to other language in Instruction 20 that is found in a different part of the *Kolcraft* instruction, and that language was not discussed in *Kolcraft*. More importantly, no party has argued for the dissent's various suggestions. Without the benefit of briefing and argument, we must wait for an appropriate case to consider such significant changes in our products-liability jurisprudence.

*Peterson*, 400 N.W.2d at 912 (emphasis added). Numerous courts—in cases involving a variety of products that are not inherently dangerous—agree.[5]

[¶11.] Karsts further contend that Instruction 20 was erroneously taken from Restatement (Second) of Torts § 402A comment k, which applies only to products that are unavoidably unsafe (for example, medicines that cause serious side effects but treat deadly illnesses). Karsts point out that the tarp system was not such a product. Instruction 20 was not, however, taken from comment k. Rather, each of

---

5. *See, e.g.*, *Pritchett v. Cottrell, Inc.*, 512 F.3d 1057, 1063 (8th Cir. 2008) (ratchet system used to tie automobiles to trailer); *McMahon v. Bunn-O-Matic Corp.*, 150 F.3d 651, 657 (7th Cir. 1998) (coffee maker and Styrofoam cup); *Purvis v. Consol. Energy Prods. Co.*, 674 F.2d 217, 222 n.10 (4th Cir. 1982) (curing barn); *Bruce v. Martin-Marietta Corp.*, 544 F.2d 442, 447 (10th Cir. 1976) (aircraft); *Dart v. Wiebe Mfg., Inc.*, 709 P.2d 876, 878 n.1 (Ariz. 1985) (en banc) (paper shredder and conveyor belt); *Mason v. Mitcham*, 382 S.W.3d 717, 719 (Ark. Ct. App. 2011) (double-bunk trailer); *Union Supply Co. v. Pust*, 583 P.2d 276, 282 n.5 (Colo. 1978) (en banc) (conveyor belt); *McBride v. Ford Motor Co.*, 673 P.2d 55, 64 (Idaho 1983) (branch-chipping machine); *Sollami v. Eaton*, 772 N.E.2d 215, 219 (Ill. 2002) (trampoline); *Ford Motor Co. v. Rushford*, 868 N.E.2d 806, 810 (Ind. 2007) (failure to warn regarding automobile air bags); *Aller v. Rodgers Mach. Mfg. Co.*, 268 N.W.2d 830, 834 (Iowa 1978) (saw); *Gaumer v. Rossville Truck & Tractor Co., Inc.*, 257 P.3d 292, 301 (Kan. 2011) (hay baler); *Lloyd v. Gen. Motors Corp.*, 916 A.2d 257, 272 (Md. 2007) (automobiles); *Halliday v. Sturm, Ruger & Co., Inc.*, 792 A.2d 1145, 1150 (Md. 2002) (firearms); *Moore v. Ford Motor Co.*, 332 S.W.3d 749, 760 (Mo. 2011) (en banc) (automobiles); *Rivera v. Philip Morris, Inc.*, 209 P.3d 271, 275 (Nev. 2009) (cigarettes); *Johnson v. Ford Motor Co.*, 45 P.3d 86, 91 n.12 (Okla. 2002) (automobiles); *Gann v. Anheuser-Busch, Inc.*, 394 S.W.3d 83, 88 (Tex. Ct. App. 2012) ("longneck" beer bottle); *Seattle-First Nat'l Bank v. Tabert*, 542 P.2d 774, 779 (Wash. 1975) (en banc) (automobiles); *Haase v. Badger Mining Corp.*, 682 N.W.2d 389, 395 (Wis. 2004) (silica sand).

Several courts have reached the opposite result. *See Cronin v. J.B.E. Olson Corp.*, 501 P.2d 1153, 1163 (Cal. 1972) (en banc); *McAlpine v. Rhone-Poulenc Ag Co.*, 16 P.3d 1054, 1057-59 (Mont. 2000); *Freund v. Cellofilm Props., Inc.*, 432 A.2d 925, 931 (N.J. 1981). However, Karsts do not cite these cases, similar cases, or any other authority suggesting that we abandon the Restatements' causality requirement.

Instruction 20's three sentences finds its origin in Restatement (Second) of Torts § 402A comment i, which states in part:

> The rule stated in this Section applies *only* where the defective condition of the product *makes it* unreasonably dangerous to the user or consumer. Many products cannot possibly be made entirely safe . . . . The article sold must be dangerous *to an extent beyond* that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics.

(Emphasis added.) Thus, Instruction 20's first sentence ("A product can be dangerous without being unreasonably dangerous.") and third sentence ("A product is not in a defective or unreasonably dangerous condition merely because it is possible to be injured while using it.") come from the second and third sentences of comment i quoted here. Likewise, Instruction 20's second sentence ("Even if a product is defective in some manner, you must find that the defect renders the product 'unreasonably' dangerous.") comes from the first sentence of comment i quoted here. Instruction 20 was not improperly taken from § 402A comment k language that applies only to products that are unavoidably unsafe.

[¶12.] Karsts next contend that additional instructions were required to define *unreasonably dangerous*.[6] Instruction 21, however, told the jury: "In determining whether the . . . [t]arp system was defective and unreasonably dangerous you may consider whether Shur Co. complied with the generally recognized state of the art . . . ." Moreover, it is "not error to refuse to amplify the

---

6. Karsts also contend that this opened the door to prejudicially misleading arguments by Defendants. However, Karsts did not object to the admission of the evidence forming the basis for those arguments or the arguments themselves. We therefore decline to consider this contention on appeal.

instructions given which substantially cover the principle embodied in the requested instructions." *Degen*, 90 S.D. at 407, 241 N.W.2d at 706-07 (quoting *Peters v. Hoisington*, 72 S.D. 542, 554, 37 N.W.2d 410, 416 (1949)). Here, the root words at issue are *reasonable* and *dangerous*. These are ordinary words without unusual legal meaning, and absent a request for a more specific instruction, instructing the jury with ordinary words is generally considered sufficient. *See Jorgenson v. Dronebarger*, 82 S.D. 213, 218, 143 N.W.2d 869, 872 (1966).[7] Although we think a definition should be given if requested, there was no request for additional specificity in this case.[8]

[¶13.]     Karsts finally argue that Instruction 20 unfairly emphasized Defendants' theory of the case. But as we have previously explained, "[s]trict

---

7.     Although most states provide some definition of the term *unreasonably dangerous* for the jury, *Nesselrode v. Exec. Beechcraft, Inc.*, 707 S.W.2d 371, 378 n.11 (Mo. 1986) (en banc), Missouri provides "no judicial definition" for the term whether derived from the consumer-expectation test, the risk-utility test, or otherwise. *Rodriguez v. Suzuki Motor Corp.*, 996 S.W.2d 47, 65 (Mo. 1999) (en banc). The Missouri Supreme Court reasoned that the "virtue of such a general instruction is that it allows the jury to give the concept of unreasonable danger content 'by applying their collective intelligence and experience to the broad evidentiary spectrum of facts and circumstances presented by the parties.'" *Id.* (quoting *Newman v. Ford Motor Co.*, 975 S.W.2d 147, 154 (Mo. 1998) (en banc)). "Furthermore, the perceived need to define 'unreasonable dangerousness' is largely satisfied by allowing the litigants 'to argue that the utility of a design outweighs its risks, or that consumer expectations were violated, or any other theory of unreasonable dangerousness supported by the evidence.'" *Id.* (quoting *Newman*, 975 S.W.2d at 154).

8.     If a request is made in an appropriate case, the following Restatement (Second) of Torts § 402A (1965) comment i language should be given: "The article sold must be dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics."

liability requires that the product be defective *and* unreasonably dangerous." *Peterson*, 400 N.W.2d at 912 (emphasis added). Accordingly, Instruction 18 required Karsts to prove both elements: that the tarp system "was in a defective condition which made it unreasonably dangerous to Richard Karst[.]" Instruction 20 simply recognized that because both elements were *required*, it was not sufficient for the jury to determine merely that some danger was attendant to use of the product. Thus, Instruction 20 did not *unfairly* emphasize a defense theory of the case. Karsts also failed to object to Instruction 20 on this ground. "An attorney must be clear when objecting to jury instructions 'so the trial court is advised of what possible errors exist and be granted the opportunity to correct any instructions.'" *Parker v. Casa Del Rey-Rapid City, Inc.*, 2002 S.D. 29, ¶ 15, 641 N.W.2d 112, 118 (quoting *Sundt Corp. v. State by & through S.D. Dep't of Transp.*, 1997 S.D. 91, ¶ 17, 566 N.W.2d 476, 480). Therefore, Karsts waived this argument for appeal.

[¶14.] We conclude that when considered as a whole, the instructions correctly stated the law of strict liability in this jurisdiction. The circuit court did not err in giving Instruction 20.

*Summary Judgment—Failure to Warn*

[¶15.] Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." SDCL 15-6-56(c). "The evidence must be viewed most favorably to the nonmoving party and reasonable doubts

should be resolved against the moving party. The nonmoving party, however, must present specific facts showing that a genuine, material issue for trial exists." *Peters v. Great W. Bank, Inc.*, 2015 S.D. 4, ¶ 5, 859 N.W.2d 618, 621 (quoting *Saathoff v. Kuhlman*, 2009 S.D. 17, ¶ 11, 763 N.W.2d 800, 804). "Entry of summary judgment is mandated against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Nationwide Mut. Ins. Co. v. Barton Solvents Inc.*, 2014 S.D. 70, ¶ 10, 855 N.W.2d 145, 149 (quoting *Hass v. Wentzlaff*, 2012 S.D. 50, ¶ 11, 816 N.W.2d 96, 101). A showing is not sufficient unless "the party challenging summary judgment substantiate[s its] allegations with sufficient probative evidence that would permit a finding in [its] favor on more than mere speculation, conjecture, or fantasy." *Id.* (quoting *Quinn v. Farmers Ins. Exch.*, 2014 S.D. 14, ¶ 20, 844 N.W.2d 619, 624-25).

[¶16.] The circuit court granted Wilson's and Shur's motions for summary judgment on all failure-to-warn claims. The court observed that Karsts did not identify any evidence that Richard ever read the provided warnings. Therefore, the court concluded as a matter of law that Karsts were unable to establish a causal link between the alleged inadequate warnings and Richard's injury. On appeal, Karsts argue that summary judgment was inappropriate for several reasons. First, they contend that the failure to read an irrelevant warning does not bar a failure-to-warn claim. Second, they contend that they presented sufficient evidence to raise a genuine factual dispute whether Richard read the manual. Third, they contend that Richard is entitled to a presumption that he read the warnings. Fourth, they

contend that the failure to read a warning does not preclude a failure-to-warn claim alleging improper placement of a warning.

[¶17.]         Karsts first contend that the failure to read an irrelevant warning does not bar a failure-to-warn claim.  They assert that the provided warnings were irrelevant because "Defendants did not warn of the hazards associated with removing the sleeve when the tarp was stuck open."  They also assert that the logic of the instruction manual was circular: according to the manual, the first step in converting the system from electric to manual is to "close the tarp," but the first step in operating the tarp (when the electric system fails) is to convert the system from electric to manual.  Thus, Karsts contend that notwithstanding the lack of a "causal link between the warnings and the incident, a purported failure to read [irrelevant] warnings . . . should not preclude a claim based on the lack of warnings about performing an 'open tarp' conversion."  Defendants respond that "it is simply impossible for a plaintiff who cannot prove that he or she ever read and relied upon a warning to show that alleged inadequacies in the warning's content caused the accident[.]"

[¶18.]         Causation is a necessary element of a failure-to-warn claim, whether pursued under a negligence or strict-liability theory.  *Barton Solvents*, 2014 S.D. 70, ¶ 17, 855 N.W.2d at 150-51.  In order to prove causation in a failure-to-warn claim, "[a] plaintiff must show that adequate warnings would have made a difference in the outcome, that is, that they would have been followed."  *Gen. Motors Corp. v. Saenz ex rel. Saenz*, 873 S.W.2d 353, 357 (Tex. 1993); *see also Payne v. Novartis Pharm. Corp.*, 767 F.3d 526, 531-32 (6th Cir. 2014) ("The key inquiry is whether,

'had additional warnings been given, the plaintiff would not have sustained her injuries.'" (quoting *Smith v. Pfizer Inc.*, 688 F. Supp. 2d 735, 746 (M.D. Tenn. 2010))). A "[p]laintiff's failure to read the available warning and instruction literature harms the ability to prove that a different warning would have changed his conduct." 2 David G. Owen & Mary J. Davis, *Owen & Davis on Prods. Liab.* § 11:20 (4th ed. 2014). Therefore, courts generally hold that a plaintiff's failure to read a given warning precludes establishment of the causation element even if the warning is arguably inadequate. *See Johnson v. Niagara Mach. & Tool Works*, 666 F.2d 1223, 1225 (8th Cir. 1981) ("[A]n issue as to the adequacy of a warning necessarily presupposes that the operator has read the warning."); *Palmer v. Volkswagen of Am., Inc.*, 904 So. 2d 1077, 1084 (Miss. 2005) ("The presence or absence of anything in an unread owner's manual simply cannot proximately cause a plaintiff's damages."); *Burley v. Kytec Innovative Sports Equip., Inc.*, 2007 S.D. 82, ¶ 37 n.7, 737 N.W.2d 397, 410 n.7 (accepting premise of defendant's argument that a student athlete injured by exercise equipment did not read the instruction manual and therefore could not establish proximate cause, but rejecting argument because the athlete's trainer, who was responsible for and oversaw the athlete's use of the equipment, had read the manual). The circuit court correctly concluded that Richard's failure to read the provided warnings would be fatal to a liability theory premised on the content of those warnings because causation could not be established.

[¶19.]     Karsts alternatively contend that they presented "evidence that, when viewed in the light most favorable to the Karsts, [established that Richard] read the

warnings." It is not disputed that due to the nature of his injury, Richard cannot remember whether he read the provided warnings prior to the accident. Therefore, Karsts rely on the depositions of three other witnesses. First, Wilson's sales manager, Richard Gase, stated in his deposition that he "would . . . tell customers that [he] thought there was very good information in [the] owner's manual and that it was important to read through it." Second, one of Karsts' expert witness, Dr. Laughery, opined in his deposition that Richard "was a guy who wasn't in a hurry . . . and . . . who, by all the things that I read, was responsible, that had he been given adequate information, adequate warnings, he would have complied with them." Finally, one of the employees at the grain elevator, Todd Hauck, stated in his deposition that he saw Richard climb up to the work platform on the back of the trailer, climb down and read "something," ask for a wrench, then climb back up to the platform and release the flex arm from the roll tube.

[¶20.] The foregoing evidence was not sufficient to resist summary judgment. "Where the theory of liability is failure to warn adequately, the evidence must be such as to support a reasonable inference, rather than a guess, that the existence of an adequate warning may have prevented the accident before the issue of causation may be submitted to the jury." *Conti v. Ford Motor Co.*, 743 F.2d 195, 198 (3d. Cir. 1984); *see also Barton Solvents*, 2014 S.D. 70, ¶ 10, 855 N.W.2d at 149. Mr. Gase's statement about unidentified customers and "good information" creates no inference that Richard actually read the specific warnings that are at issue in this case. So also, Dr. Laughery made clear that his opinion whether Richard may have read the supplied warnings prior to the accident was speculative. Dr. Laughery conceded

that he was not making any assumptions on whether Richard read the owner's manual prior to the accident. In fact, Dr. Laughery indicated that Richard's behavior was typical of someone who either did not recall that the owner's manual included a section on converting from electric to manual use or someone who had not read the manual in the first place.[9] Finally, Mr. Hauck could not identify what it was that he saw Richard read immediately prior to the accident. Mr. Hauck was not even sure whether the reading material consisted of a book or a single sheet of paper. Moreover, Richard testified that he kept all of the instruction manuals for his trailers in his workshop, and the relevant manual was not found at the accident site where Mr. Hauck observed Richard reading "something." Thus, Karsts' evidence was insufficient to create a question of fact for a jury: it did not "permit a finding in [their] favor on more than mere speculation, conjecture, or fantasy." *See Barton Solvents*, 2014 S.D. 70, ¶ 10, 855 N.W.2d at 149 (quoting *Quinn*, 2014 S.D. 14, ¶ 20, 844 N.W.2d at 624-25).

[¶21.]     Nevertheless, Karsts contend that Richard was entitled to a presumption that he read the provided warnings prior to the accident. They point out that in the context of moving-vehicle accidents, "[t]here is a presumption, in the absence of evidence to the contrary, that a person killed in an accident was exercising due care for his protection at, and immediately before, the accident."

---

9.     In his deposition, Dr. Laughery was asked: "So are you assuming that [Richard] had not read the owner's manual before the accident?" Dr. Laughery replied: "I'm making no assumption on that. But if his—there's no indication that he did read the owner's manual or that he remembered there being a section on page 17 about the conversion, that his behavior would be typical with respect to that."

*Dehnert v. Garrett Feed Co.*, 84 S.D. 233, 236, 169 N.W.2d 719, 721 (1969).  They further point out that this presumption has been extended to accidents resulting in amnesic plaintiffs.  *See Schultz & Lindsay Constr. Co. v. Erickson*, 352 F.2d 425, 434 (8th Cir. 1965).  According to Karsts, "reading warnings is part of the exercise of due care[.]"  Therefore, they contend that "the [circuit] court should have applied [a] presumption that [Richard] read the warnings."

[¶22.]        The presumption of due care afforded persons injured or killed in moving-vehicle accidents cannot be extended to create a presumption that Richard read the warning in Shur's manual.  The presumption of due care articulated in *Dehnert* "is based on the natural instinct of self-preservation and the normal disposition to avoid self-destruction or personal harm."  *Dehnert*, 84 S.D. at 236, 169 N.W.2d at 721.  Therefore, for the presumption to be operative, the injured person must necessarily appreciate the danger inherent in the activity.  Yet Karsts concede that "there was no evidence [Richard] knew of the danger of converting from electric to manual with the tarp open."  Additionally, Karsts' expert witnesses negated the basis for a presumption in cases involving the reading of an instruction manual.  Dr. Laughery indicated that most people do not read instruction manuals.  And Dr. Warren indicated that he agreed with the "general premise" that "most people who purchase products don't read the owner's manual."  Thus, the basis for presuming a consumer has read the warnings in an instruction manual is not present here.  We cannot extend the general presumption of due care in operating an automobile to a presumption that Richard read the particular warnings that were given in this case.

[¶23.] Karsts finally contend that summary judgment on their inadequate-warning claim was improper because the placement of the warning label on the equipment was inadequate. Karsts submitted an affidavit from Dr. Laughery stating that a label placed on the sleeve of the roll tube "is more likely to be effective." Karsts claim that even if Richard had not read the manual or label, a jury question existed as to whether Shur's placement of the label at the flex arm's base was inadequate.

[¶24.] The "failure to read a warning does not necessarily bar recovery where . . . the plaintiff claims inadequate communication of the warning caused the failure to read it." *In re Levaquin Prods. Liab. Litigation*, 700 F.3d 1161, 1168 (8th Cir. 2012). Karsts' claim is premised on the affidavit of Dr. Laughery. Defendants asked the circuit court to strike the affidavit. They asserted that it was new opinion evidence submitted after the expert-disclosure deadline for the purpose of avoiding summary judgment. The circuit court denied the motion. On appeal, Defendants continue to assert that Dr. Laughery's affidavit was improper. Defendants also assert that even if the affidavit is considered, it is not sufficient to raise a genuine issue of material fact on Karsts' improper-placement theory.

[¶25.] We agree with the circuit court that the affidavit was proper. We acknowledge that "[a]n issue of material fact will not be created by a party who attempts to change its testimony without an explanation for its change or a showing that its answers were ambiguous and that the new affidavit merely seeks to clarify that testimony." *DFA Dairy Fin. Servs., L.P. v. Lawson Special Tr.*, 2010 S.D. 34, ¶ 21, 781 N.W.2d 664, 670. But this rule contemplates "a substantial change in

testimony[,]" *id.*, and it is meant to prevent a party from "creat[ing] issues of material fact by contradicting his own earlier sworn testimony[,]" *Guilford v. Nw. Pub. Serv.*, 1998 S.D. 71, ¶ 12, 581 N.W.2d 178, 181. Here, Defendants have not directed our attention to any unexplained contradictions between Dr. Laughery's affidavit and his earlier statements. Therefore, the court's consideration of the affidavit was proper.

[¶26.] Nevertheless, Dr. Laughery's affidavit was not sufficient to raise a genuine issue of material fact regarding an improper-placement theory. According to Karsts, Dr. Laughery expressed an "opinion that a warning should have been located on the sleeve covering the spline where a user would see it during the conversion process." At oral argument, Karsts also asserted that an inadequate-warning opinion was given in both Dr. Laughery's report and deposition. Based on the report, the deposition, and the affidavit, Karsts contend that they "presented evidence that the warning was improperly located[.]" Shur responds that Dr. Laughery's affidavit did not express an opinion "that placing the label at the base of the flex arms was inadequate." Wilson responds that Dr. Laughery "did not criticize the location of the warning label in his report or during his deposition." Karsts reply that such arguments "elevate[] form over substance."

[¶27.] "Those resisting summary judgment must show that they will be able to place sufficient evidence in the record at trial to support findings on all the elements on which they have the burden of proof." *Barton Solvents*, 2014 S.D. 70, ¶ 16, 855 N.W.2d at 150 (emphasis omitted) (quoting *Chem-Age Indus., Inc. v. Glover*, 2002 S.D. 122, ¶ 18, 652 N.W.2d 756, 765). In a failure-to-warn case, the

plaintiff must "identify specific, affirmative evidence indicating that the . . . warnings were *inadequate*." *Id.* ¶ 22, 855 N.W.2d at 152 (emphasis added). Dr. Laughery's evidence did not meet that standard. Although Dr. Laughery's affidavit mentions the placement of the supplied warnings, the affidavit only offers an inadequacy opinion on the issue of warning content. Additionally, the introduction and conclusion of the affidavit indicate Dr. Laughery was responding to the question whether Richard read the warnings that were given. Ultimately, instead of opining that the placement of the warning label was inadequate, Dr. Laughery went no further than to express an opinion that an additional warning may have been "appropriate." He stated:

> In this case it would have been appropriate for a warning relating to the hazards of converting the tarp from electric to manual use to be placed up on the sleeve that covered the spline that needed to be accessed during the conversion. An appropriately designed warning positioned on the sleeve is more likely to be effective because it is going to be encountered at the time of the conversion.

Further, we find no inadequacy-of-placement opinion in Dr. Laughery's deposition or report.

[¶28.]     As the nonmoving party, Karsts "may only avoid [properly supported] summary judgment by 'setting forth *specific facts* showing that there is a genuine issue for trial.'" *Gades v. Meyer Modernizing Co.*, 2015 S.D. 42, ¶ 7, 865 N.W.2d 155, 158 (quoting SDCL 15-6-56(e)) (emphasis added). Dr. Laughery's statement about what might be an appropriate placement is not equivalent to the requisite opinion that the location of the provided warning label was actually inadequate.

Therefore, Karsts did not meet their responsive summary-judgment burden.[10] *See*

*Barton Solvents*, 2014 S.D. 70, ¶ 18, 855 N.W.2d at 151 (affirming summary

judgment on a failure-to-warn claim because plaintiff did not identify any evidence

or expert testimony indicating that the provided warnings were "inadequate").

[¶29.]     Summary judgment was correctly granted on Karsts' failure-to-warn

claims involving both content and placement theories.  Karsts did not present

evidence sufficient for a jury to infer that Richard read the provided warnings prior

to the accident, and there is no presumption that he did.  Without such evidence,

Karsts could not meet their burden of establishing causation between the alleged

deficiencies in the content of the provided warnings and the injury Richard suffered

---

10.    Karsts contend that the language in Dr. Laughery's affidavit, deposition, and
       report are sufficient to conclude that he thought the placement of the
       warning was inadequate.  According to Karsts, to hold otherwise would be to
       require "magic language."  We disagree.  Dr. Laughery was an experienced
       expert who has authored or edited three books on warnings, authored one
       book on information technology, and authored or co-authored over 150
       articles.  He has also testified in state and federal courts across the country.
       Moreover, he clearly demonstrated his ability to give an opinion to the
       requisite degree of certainty when he believed a warning was inadequate.
       For example, in Dr. Laughery's deposition, he expressed an inadequate-
       content opinion, stating:

              The label fails, in that it simply sends the user to the owner's
              manual for instructions.  The label doesn't contain any
              instructions about tying down or any of these other ways that it
              might have been prevented, whatever they might be.

       Further, later in Dr. Laughery's deposition, he specifically opined on the
       content of the provided warnings, describing them as inadequate.  In
       contrast, on the issue of placement, his affidavit merely comments that the
       placement of a warning on the sleeve would have been appropriate and more
       likely to be effective than the label actually supplied.  However, simply
       indicating that Placement 1 is appropriate or better than Placement 2 does
       not establish that Placement 2 is inadequate unless it is also established that
       Placement 1 is the minimum standard.

as a result of the accident. Karsts also failed to provide expert testimony establishing that the provided warnings were inadequately placed. Therefore, the circuit court did not err in granting Defendants summary judgment on Karsts' failure-to-warn claims.

*Assumption-of-risk Defense*

[¶30.]      At trial, Defendants asserted they could not be held liable for Richard's injuries because he assumed the risk of injury. "[A] person assumes the risk of injury when the person: '(1) [has] actual or constructive knowledge of the risk; (2) appreciate[s] its character; and (3) voluntarily accept[s] the risk, with the time, knowledge, and experience to make an intelligent choice.'" *Duda v. Phatty McGees, Inc.*, 2008 S.D. 115, ¶ 13, 758 N.W.2d 754, 758 (quoting *Ray v. Downes*, 1998 S.D. 40, ¶ 11, 576 N.W.2d 896, 898). According to Karsts, the circuit court erred in instructing the jury on assumption of the risk because "there was no evidence [Richard] knew of the danger of converting from electric to manual with the tarp open." Defendants argue that there was sufficient evidence to present the defense to the jury. Defendants also argue that this issue is moot because the special-verdict form indicates the jury never reached the issue of assumption of the risk.

[¶31.]      Karsts argue that under Instructions 23 and 27, "the jury considered the assumption-of-risk defense in making its negligence determination." Instruction 23 stated, in part: "If a person assumes the risk of injury or damage, the person is not entitled to any recovery." Instruction 27 stated, in part:

> The issues to be determined by you with regard to Richard
> Karst's negligence claim against Shur Co. are these:
> First, did Richard Karst assume the risk of injury or damage?

> If you find Richard Karst assumed the risk, you will return a verdict for Shur Co. If you find Richard Karst did not assume the risk, you have a second issue to determine, namely:
>
> Was Shur Co. negligent?

This latter instruction indicated that the jury should consider assumption of the risk before considering the question of the defendant's negligence. Therefore, Karsts contend that "[t]he jury's verdict finding that Shur-Co was not negligent . . . *did* 'consider' and 'depend on' the assumption-of-risk defense."

[¶32.]     Although Instructions 23 and 27—taken alone—might suggest the jury considered assumption of the risk, all of the jury instructions, including the special-verdict form, must be read together. And any question that the jury might have considered the assumption-of-risk defense is dispelled by examining the special-verdict form. The special-verdict form required the jury to address these claims and defenses in a precise sequence. The form's introduction stated: "Please answer the following questions in the order in which they appear. . . . Carefully follow the instructions which appear after each question, and do not answer any question that you are instructed to not answer or skip." Question one asked the jury to decide whether Defendants were strictly liable for defective design. Question two asked the jury to decide whether Shur was liable for negligence. At the end of the second question, the form instructed: "If you did not find in favor of [Karsts] on either Question 1 or question 2, you are finished and should *not* answer any other questions. Have the foreperson sign and date the verdict form." The special-verdict form does not mention assumption of the risk until question five. In accordance with these instructions, the jury found in favor of Defendants on both questions one and two, marked the special-verdict form accordingly, and dutifully refrained from

answering any other questions—including question five on Defendants' assumption-of-risk defense.

[¶33.] "Juries are presumed to follow instructions of the [circuit] court." *Bland v. Davison Cty.*, 1997 S.D. 92, ¶ 15, 566 N.W.2d 452, 457. The special-verdict form prohibited the jury from considering assumption of the risk unless it had already determined that Karsts had met their burden of establishing the elements of negligence. Therefore, we must presume that the jury did not consider assumption of the risk. This issue is moot.

*Karsts' Assumption-of-risk Evidence*

[¶34.] Because the circuit court granted summary judgment on all failure-to-warn claims, the court concluded that the provided warnings were irrelevant and the court excluded evidence of those warnings at trial. Karsts argue that regardless of our decision on their appeal of the summary judgment dismissing the failure-to-warn claims, "evidence related to manuals, labels, and instructions should have been admitted to rebut misleading testimony from defense witnesses and to counter the assumption-of-risk defense."

[¶35.] The argument for use of the evidence to counter the assumption-of-risk defense is moot. Because the jury did not consider assumption of the risk, Karsts were not prejudiced by their inability to offer rebuttal evidence to the defense. As for impeachment, Defendants contend that any mention of product-warning materials during the trial was error invited by Karsts. Defendants also contend that Karsts were not prejudiced by this testimony.

[¶36.]        Karsts argue that Defendants were allowed to "suggest" that there was a warning and a "safe procedure" communicated to Richard that he failed to follow. However, Karsts do not point to any specific testimony as objectionable. In Karsts' reply brief, they claim that a new trial is supported by "[t]he misconduct of Shur-Co's witness—the first to testify—violating defendants' motion in limine [by] testifying about . . . warning[s.]" As Shur points out, however, this claim is misleading. The first witness called at trial was Wade Dangler. Although Dangler was an engineer employed by Shur, he was called to testify by Karsts. More importantly, Karsts' attorney invited the testimony to which Karsts now object. Dangler's testimony regarding warnings came as his answers to Karsts' counsel's questions accusing Shur of not telling its customers about the danger of standing on the platform or of removing the sleeve when the tarp was in the open position. The testimony was also Dangler's answer to Karsts' counsel's questions about the warning information that the manual included or failed to include.

[¶37.]        "[A] party will not be heard to complain on appeal of errors which he himself induced or provoked the court or the opposite party to commit." *Veith v. O'Brien*, 2007 S.D. 88, ¶ 27, 739 N.W.2d 15, 24 (quoting *Taylor Realty Co. v. Haberling*, 365 N.W.2d 870, 873 (S.D. 1985)). In this case, an in limine ruling prohibited testimony about the warnings actually provided, but Karsts provoked such testimony by their questioning. We have stated that "when a party through his questions 'opens the door' to admission of evidence, the party may not challenge the admission of that evidence." *Id.* By extension, a party cannot elicit testimony prohibited by an in limine ruling and then demand that the in limine ruling be set

aside in order to introduce evidence to counter that testimony. To hold otherwise would permit a party to unilaterally bypass the in limine ruling.

[¶38.] Additionally, the court issued a curative instruction. Instruction 15A stated: "You should not consider whether there are any warnings, labels, or owner's manuals that may pertain to any of the issues you are being asked to decide. I have ruled that these matters are not relevant to the parties' claims." As with other instructions, "we presume that juries understand and abide by [curative] instructions." *Baddou v. Hall*, 2008 S.D. 90, ¶ 15, 756 N.W.2d 554, 559. Therefore, the circuit court did not err by refusing to admit evidence of the provided warnings.

[¶39.] Affirmed.

[¶40.] GILBERTSON, Chief Justice, and SEVERSON, Justice, and PORTRA, Circuit Court Judge, concur.

[¶41.] KERN, Justice, concurs in part and dissents in part.

[¶42.] PORTRA, Circuit Court Judge, sitting for WILBUR, Justice disqualified.

KERN, Justice (concurring in part and dissenting in part).

[¶43.] To the extent that the issue regarding the admission of Dr. Laughery's affidavit is properly preserved for review,[11] I concur with the majority that the

---

11. Although Shur argued in its brief that Dr. Laughery's affidavit was improperly admitted, it failed to file a notice of review. "This Court has consistently held that failure to comply with the notice of review requirements results in a waiver." *A.L.S. Props., Silver Glen v. Graen*, 465 N.W.2d 783, 787 (S.D. 1991).

circuit court properly admitted the affidavit. As to the remaining issues presented by the Karsts, I respectfully dissent.

*Jury Instruction 20*

[¶44.] While it is true that each sentence of Instruction 20 is a correct statement of law, it should not have been given for several reasons. First, in order to give this type of instruction, the moving party must make an initial showing that the facts of the case comport with the requirements of comment k of the Restatement (Second) of Torts § 402A. Second, Instruction 20 did not correctly define for the jury the necessary standard to determine whether the product was unreasonably dangerous. This standard is set forth in the consumer-expectation test. Finally, the instruction as given was a confusing conglomeration of legal principles that did little to guide the jury in fairly analyzing the complex claims presented.

[¶45.] The first sentence of Instruction 20 states, "A product can be dangerous without being unreasonably dangerous." The notion that "[a] product can be dangerous without being unreasonably dangerous" is derived from the Restatement (Second) of Torts § 402A, comment k.[12] *Cmty. Television Servs., Inc. v.*

---

12. A classic example of this type of product is

> the vaccine for the Pasteur treatment of rabies, which not uncommonly leads to very serious and damaging consequences when it is injected. Since the disease itself invariably leads to a dreadful death, both the marketing and the use of the vaccine are fully justified, notwithstanding the unavoidable high degree of risk which they involve. Such a product, properly prepared, and accompanied by proper directions and warning, is not defective, nor is it *unreasonably* dangerous.

Restatement (Second) of Torts § 402A, cmt. k.

*Dresser Indus., Inc.*, 435 F. Supp. 214, 216 (D.S.D. 1977), *aff'd*, 586 F.2d 637 (8th Cir. 1978); *see also* Am. L. Prod. Liab. 3d § 17:34 ("Comment k indicates that a product can be dangerous without being 'unreasonably' dangerous." (citing *Kunnemann v. Janssen Pharm. Prods., L.P.*, 2008 WL 5101116 (N.D. Ill. 2008) (applying Illinois law); *Cmty. Television Servs.*, 435 F. Supp. 214 (applying South Dakota law); *Huff v. Elmhurst-Chi. Stone Co.*, 419 N.E.2d 561 (Ill. App. Ct. 1981))). Comment k recognizes that some products are "incapable of being made safe for their intended and ordinary use" and carves out an exception to strict liability so long as the product is "properly prepared and accompanied by proper directions and warning[s]." Restatement (Second) of Torts § 402A, cmt. k. A comment k instruction is an affirmative defense. *Hill v. Searle Lab., a Div. of Searle Pharm., Inc.*, 884 F.2d 1064, 1068 (8th Cir. 1989). Thus, to avail themselves of a comment k instruction, a defendant must show "that the product is incapable of being made safe; that the product was properly prepared and marketed; and that the product was accompanied by a proper warning." Am. L. Prod. Liab. 3d § 17:34 (citing *Amore v. G.D. Searle & Co.*, 748 F. Supp. 845 (S.D. Fla. 1990) (applying Florida law); *Kline v. Pfizer, Inc.*, 2008 WL 4787577 (E.D. Pa. 2008) (applying Pennsylvania law); *White v. Wyeth Labs., Inc.*, 533 N.E.2d 748 (Ohio 1988)).

[¶46.] Defendants, in this case, failed to make such a preliminary showing. Moreover, it was undisputed that the product was capable of being designed in a safer fashion. The evidence at trial established that Shur had redesigned the system exposing the spline so that it was accessible for conversion. The alternative

design was safer for the user, more functional and less expensive. As such, Defendants were not entitled to a comment k instruction.

[¶47.] Second, the instruction failed to provide the correct standard to define an unreasonably dangerous product. Defendants argue that the law set forth in Instruction 20 was derived from the Restatement (Second) of Torts § 402A, comment i. However, comment i specifically provides the appropriate standard for determining whether a product is unreasonably dangerous—the standard which is lacking in Instruction 20. Comment i states that for a product to be unreasonably dangerous, it "must be dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics." Restatement (Second) of Torts § 402A, cmt. i. This standard, known as the "consumer-expectation test," was not substantially contained within Defendants' Instruction 20.

[¶48.] The circuit court, in attempting to correctly instruct the jury, was placed in an untenable situation in light of the confusion caused by our decision in *Kolcraft*, 2004 S.D. 92, 686 N.W.2d 430. In *Kolcraft*, this Court reviewed the following jury instruction:

> A product is in a defective condition and unreasonably dangerous to the user if it is not reasonably fit for the ordinary and reasonably foreseeable purposes for which it was sold or manufactured and expected to be used. [(consumer-expectation test)].
>
> A product is in a defective condition unreasonably dangerous to the user if it could have been designed to prevent a foreseeable harm without significantly hindering its function or increasing its price. [(risk-utility test)].

> A product can be dangerous without being unreasonably dangerous. Even if a product is defective in some manner, you must find that the defect renders the product "unreasonably" dangerous. A product is not in a defective or unreasonably dangerous condition merely because it is possible to be injured while using it. [(Instruction 20 herein)].

*Id.* ¶ 28, 686 N.W.2d at 444-45.

[¶49.] In determining whether the *Kolcraft* jury was correctly instructed, we held that the first two paragraphs of the instruction gave conflicting definitions of a defective product. *Kolcraft*, 2004 S.D. 92, ¶ 29, 686 N.W.2d at 445. We reversed and remanded with instructions to frame the two paragraphs in the disjunctive. *Id.* We did not discuss or endorse the third paragraph of the instruction. *See id.* The *Kolcraft* court noted that the plaintiff argued that "the 'consumer expectation' test was inappropriate in a defective design case." *Id.* ¶ 28 n.8. We declined to consider the issue because it was raised for the first time in a reply brief. *Id.*

[¶50.] Our decision in *Kolcraft* treats as mutually exclusive the risk-utility test advanced by Karsts in Instruction 19, and the consumer-expectation test advanced by Defendants, albeit in an inaccurate form, in Instruction 20. *Id.* ¶ 29, 686 N.W.2d at 445. Yet we also require a plaintiff to prove that a product is *both* defective and unreasonably dangerous. *E.g.*, *Peterson*, 400 N.W.2d at 912. The difficulty with our position in *Kolcraft* is that the only provision in the Restatement (Second) of Torts § 402A that defines an unreasonably dangerous product is the consumer-expectation test, and we have said that it cannot be given with the risk-utility test. *See* Restatement (Second) of Torts § 402A, cmt. i.

[¶51.] Accordingly, we should take this opportunity to consider the current state of our strict products liability jurisprudence. It is clear from the arguments of

counsel that our sole reliance on the outdated principles contained in the

Restatement (Second) of Torts § 402A is no longer workable. What is not so clear is

where, precisely, South Dakota stands on formally adopting the risk-utility test as

the exclusive test to be used in strict products-liability claims. *See Robinson v.*

*Brandtjen & Kluge, Inc.*, 500 F.3d 691, 696 n.2 (8th Cir. 2007) ("It is unclear

whether South Dakota has adopted, or would adopt, the so-called 'risk-utility test,'

in addition to the consumer-expectations test of section 402A, for determining the

existence of a defective condition"); *Branham v. Ford Motor Co.*, 701 S.E.2d 5, 14

n.13 (S.C. 2010) (categorizing South Dakota as "an explicit either-or option" relating

to risk-utility or consumer expectations (citing *Kolcraft*, 2004 S.D. 92, 686 N.W.2d

430)); *N. Star Mut. Ins. v. CNH Am. LLC*, 2014 WL 897023 (D.S.D. 2014) (applying

South Dakota law and using the risk-utility test).

[¶52.]     The Restatement (Third) "adopts a reasonableness ('risk-utility

balancing') test as the standard for judging the defectiveness of product designs . . .

[T]he test is whether a reasonable alternative design would, at reasonable cost,

have reduced the foreseeable risks of harm posed by the product and, if so, whether

the omission of the alternative design . . . rendered the product not reasonably safe."

Restatement (Third) of Torts: Prod. Liab. § 2, cmt. d.

> A broad range of factors may be considered in determining
> whether an alternative design is reasonable and whether its
> omission renders a product not reasonably safe. The factors
> include, among others, the magnitude and probability of the
> foreseeable risks of harm, the instructions and warnings
> accompanying the product, and the nature and strength of

> consumer expectations regarding the product, including
> expectations arising from product portrayal and marketing.[13]

Restatement (Third) of Torts: Prod. Liab. § 2, cmt. f. The specific adoption of these

tenets would bring clarity and stability to our strict products-liability law. It would

also provide badly needed direction to the bench and bar as to the correct standards

to apply. Further, we would be joining the majority of states, which have fully shed

the old consumer-expectation test for the more modern, revised risk-utility test as

defined in the Restatement (Third).[14] *See Branham*, 701 S.E.2d at 14 n.12, (citing

cases from the several states that "exclusively employ a risk-utility test.")

[¶53.]     Because the majority opinion has declined to adopt the risk-utility test

as set forth in the Restatement (Third) as its exclusive test in strict products-

liability claims for design defect, this discussion must wait for another day. In the

interim, South Dakota law requires the plaintiff to prove that a product is *both*

defective and unreasonably dangerous. An instruction that substantially complies

with the consumer-expectation test must be given to meet the required

"unreasonably dangerous" element. Although *Kolcraft* purports to allow an election

---

13.    The Restatement (Third) of Torts: Prod. Liab. § 2, comment g, instructs that "although consumer expectations do not constitute an independent standard for judging the defectiveness of product designs, they may substantially influence or even be ultimately determinative on risk-utility balancing in judging whether the omission of a proposed alternative design renders the product not reasonably safe." For an excellent discussion on the role of consumer-expectations in risk-utility balancing, see *Wright v. Brooke Grp. Ltd.*, 652 N.W.2d 159, 170-71 (Iowa 2002).

14.    Another feasible option may be adopting the modified consumer-expectation test set forth in *Potter*, 694 A.2d at 1330-35. The modified consumer-expectation test is advantageous in that it does not require a reasonable alternative design in all cases and permits risk-utility balancing in appropriate cases such as the one before us now. *Id.* at 1329-35.

between the risk-utility test or the consumer-expectation test, the risk-utility test requires consideration of consumer expectations under both the Restatement (Second) and (Third) of Torts.[15]  Instructions on both the risk-utility test and consumer-expectation test must be given to correctly instruct the jury.  To the extent that *Kolcraft* is inconsistent with this approach it should be overruled.

[¶54.]    Instruction 20 should not be given.  It is a conglomeration of a remark made in reference to comment k of the Restatement (Second) § 402A, *supra* ¶ 46 a paraphrased sentence from the Restatement (Third) of Torts: Prod. Liab. § 2, comment a; and a cherry-picked portion from a jury instruction given in *Wilson v. General Motors Corp.*, 311 N.W.2d 10, 13 (N.D. 1981), which excludes the first-half of the instruction that originally contained the full consumer-expectation test. "Jury instructions should not be patched together from snippets of appellate opinions taken out of context but should rely first on the language of the statute." 75A Am. Jur. 2d Trial § 958.  Instruction 20 was not discussed in *Kolcraft* and although the majority opinion has not found its use to constitute reversible error, neither has its use received a glowing endorsement.

[¶55.]    As to the present case, "[n]o court has discretion to give incorrect, misleading, conflicting, or confusing instructions." *State v. Whistler*, 2014 S.D. 58, ¶ 13, 851 N.W.2d 905, 910 (quoting *State v. Zephier*, 2012 S.D. 16, ¶ 9, 810 N.W.2d

---

15.    The Restatement (Second) requires the plaintiff to prove that the product is both defective and unreasonably dangerous.  The unreasonably dangerous element invokes the consumer expectation test for the proper standard.  *See* Restatement (Second) of Torts § 402A, cmt. i.  Likewise, the Restatement (Third) looks to consumer expectations as part of its balancing test.  *See* Restatement (Third) of Torts: Prod. Liab. § 2(b), cmt. g.

770, 772). However, "[t]o constitute reversible error, an instruction must be shown to be both erroneous and prejudicial, such that 'in all probability [it] produced some effect upon the verdict and [was] harmful to the substantial rights of a party.'" *Id.* (quoting *State v. Cottier*, 2008 S.D. 79, ¶ 7, 755 N.W.2d 120, 125). The Karsts were prejudiced by Instruction 20.

[¶56.]     Instruction 20 failed to provide an appropriate standard by which the jury could judge a dangerous product from an unreasonably dangerous product. The absence of an appropriate standard in Instruction 20 invited misleading and confusing arguments from Defendants, including contentions that the tarp system was not unreasonably dangerous because Richard continued to use the tarp after the accident and that Defendants were unaware of any other accidents or near misses involving the tarp system. It also paved the way for the following compare/contrast argument with unavoidably unsafe products, specifically referencing Instruction 20:

> If you think about this, there are a lot of unsafe products. Things are just dangerous. Knives, guns, your iron, anything with electric, a heating element, the cars you drive here every day. There's danger in all sorts of equipment. But something being dangerous or capable of causing injury is not the same thing as it being - - is as a thing being defective. That's an entirely different notion, and it's [Karsts'] burden to establish that in this case.

Because Instruction 20 was both erroneously given in its present form and prejudicial, I would reverse and remand for a new trial.

*Summary Judgment—Failure-to-Warn*

[¶57.]     I also disagree that summary judgment was appropriate on Karsts' failure-to-warn claims. "Summary judgment is a drastic remedy, and should not be

granted unless the moving party has established a right to a judgment with such clarity as to leave no room for controversy." *Donald Bucklin Constr. v. McCormick Constr. Co.*, 2013 S.D. 57, ¶ 31, 835 N.W.2d 862, 869 (quoting *Berbos v. Krage*, 2008 S.D. 68, ¶ 15, 754 N.W.2d 432, 436). "Using summary judgment to dispose of claims that have ample evidence and questions for the jury goes beyond our repeatedly admonished use of summary judgment." *Burley*, 2007 S.D. 82, ¶ 52, 737 N.W.2d at 413 (Sabers, J., dissenting).

[¶58.]      In relation to their inadequate warning claim, Karsts presented a genuine issue of material fact as to whether Richard read the owner's manual for the tarp system. When the tarp system malfunctioned, the first thing Richard did was check the electric systems and then the motor, consistent with the procedure contained in the owner's manual for troubleshooting. After this failed to rectify the problem, a witness observed Richard climb onto the trailer, look at the tarp system, and then come down and read something.[16] When he was done reading, Richard asked for some tools and proceeded to try to convert the tarp system from electric to manual use. This was the next logical step as set forth in the owner's manual. In addition, Karsts produced evidence that it was customary for Wilson Trailers to provide an owner's manual along with the tarp system and encourage customers to read the information. Karsts' expert opined that Richard was a responsible person

---

16. Defendants argue that the owner's manual was not located at the scene of the accident so Richard could not have referenced it. This is not dispositive as there was no evidence that anyone looked for the owner's manual until three and one half years after the accident. The Karsts' owner's manual was never located. Further, a reasonable juror could certainly have inferred that the item he took the time to get off the truck to read would be something helpful to him—the manual.

and if "given adequate information, adequate warnings, he would have complied with them." With the evidence Karsts presented, there could be a reasonable difference of opinion in the interpretation of the facts, and summary judgment was not appropriate. *See Hamilton v. Sommers*, 2014 S.D. 76, ¶ 39, 855 N.W.2d 855, 867 ("Causation is generally a question of fact for the jury except when there can be no difference of opinion in the interpretation of the facts." (quoting *Weiss v. Van Norman*, 1997 S.D. 40, ¶ 13, 562 N.W.2d 113, 116)).

[¶59.] I reach the same result as to summary judgment on Karsts' inadequate placement claim. There was a warning label on the rear flex arm of the tarp system indicating that it was under spring tension. But the label was located at the base of the rear flex arm, several feet below the roll sleeve where the tension was actually held and where it was necessary to perform the work to convert the tarp system from electric to manual use. In Dr. Laughery's affidavit, he indicated that:

> 5. One of the purposes of warning is to get people to think about the right issue at the right time. This means that the warning needs to be appropriately positioned and placed on the product to be effective when needed. A warning in a manual is not necessarily going to be as effective as a warning on the product which is encountered at the time of use.
>
> 6. In this case it would have been appropriate for a warning relating to the hazards of converting the tarp from electric to manual use to [be] placed up on [sic] the sleeve that covered the spline that needed to be accessed during conversion. An appropriately designed warning positioned on the sleeve is more likely to be effective because it is going to be encountered at the time of conversion.
>
> If presented with a proper warning system, it is my opinion that Mr. Karst would have likely followed the warnings and instructions provided.

Thus, Dr. Laughery opined that warnings need to be appropriately positioned; that it would have been appropriate for a warning label to be placed on the roll sleeve of

the rear flex arm; and that had the warning system been proper, Mr. Karst would have followed it.

[¶60.]    The majority opinion parses words about Dr. Laughery's use of the term "appropriate" and finds his "statement about what might be an appropriate placement is not equivalent to the requisite opinion"—the requisite opinion being that the placement of the warning label "was actually inadequate." *See supra* ¶ 29. Without need to turn to the dictionary meaning of the word "appropriate," we can easily consider the context of the situation. The salient issue in Karsts' inadequate warning claim is whether there should have been a warning label on the roll sleeve. Dr. Laughery was asked to give his expert opinion regarding the placement of the warning label. It was his opinion that it would have been appropriate for a warning label to be placed on the roll sleeve. His testimony fulfilled the requirements of SDCL 19-19-702 and should have been admitted.[17]

*Assumption-of-the-Risk*

[¶61.]    Finally, Defendants were not entitled to an instruction on assumption of the risk. "[A] person assumes the risk of injury when the person: '(1) [has] actual or constructive knowledge of the risk; (2) appreciate[s] its character; and (3) voluntarily accept[s] the risk, with the time, knowledge, and experience to make an intelligent choice.'" *Phatty McGees*, 2008 S.D. 115, ¶ 13, 758 N.W.2d at 758 (quoting *Ray*, 1998 S.D. 40, ¶ 11, 576 N.W.2d at 898). "Failure to establish any one of the . . .

---

17.    To be admissible, Dr. Laughery's opinion must have assisted the jury in understanding the evidence or determining a factual issue, been based upon sufficient facts or data and been the product of reliable principles and methods, and Dr. Laughery must have applied the principles and methods reliably to the facts of the case. SDCL 19-19-702.

three criteria [is] fatal to [an assumption-of-the-risk] defense[.]" *Westover v. E. River Elec. Power Coop., Inc.*, 488 N.W.2d 892, 901 (S.D. 1992). As an initial matter, the majority opinion foreclosed any actual knowledge Richard may have had of the risk when it accepted Karsts' concession that "there was no evidence [Richard] knew of the danger of converting from electric to manual with the tarp open" as a basis to deny a presumption of due care. *See supra* ¶ 22. That leaves constructive knowledge.

[¶62.] Constructive knowledge is "imputed if the risk is so plainly observable that 'anyone of competent faculties could be charged with knowledge of it.'" *Goepfert v. Filler*, 1997 S.D. 56, ¶ 8, 563 N.W.2d 140, 143 (quoting *Westover*, 488 N.W.2d at 901). Karsts offered the following expert opinion from Dr. Laughery:

> The hazards associated with the electric tarping system failing while the tarp is in the open position and the spring arm is under tension are not open and obvious. *It cannot be assumed that the hazards and potential consequences will be known or determined by the product consumer/user.* Indeed, the hazards are technical in nature, having to do with forces, tensions, etc.

(Emphasis added.) Moreover, Shur's lead engineer testified at trial that in order to tell if the torsion spring was under tension, one must know "what to look for." Tom Heinen, a twenty-year employee of the grain elevator where the accident occurred, testified that he did not know it was dangerous to remove the flex arm in the manner Richard did and that he did not anticipate that there would be tension on the flex arm. He further testified that he thought that when Richard removed the flex arm, it would "be in the loose position." Unlike the situation in *Goepfert*, where the plaintiff jumped from a moving car, the risk in this case was not plainly observable.

[¶63.]        For the same reasons, Richard could not have appreciated the risk associated with removing the roll sleeve. *See Thomas v. St. Mary's Roman Catholic Church*, 283 N.W.2d 254, 260 (S.D. 1979) ("[A] plaintiff must only be held to assume the risk he appreciates, not the risk [that] he does not.")  Defendants produced no evidence that Richard knew of the dangerously high level of tension he would encounter while converting the open tarp from electric to manual mode.  The extent of this danger was not plainly observable and of the type that any reasonably competent person could be charged with knowledge of the risk.

[¶64.]        Karsts' substantial rights were also prejudiced by the assumption-of-the-risk instruction.  The majority opinion relies on the special verdict form and the sequential order in which it was formatted to conclude that the jury did not consider assumption of the risk.  However, the jury sat through a 12-day trial wherein Defendants wove their defense that Richard assumed the risk throughout their evidence—the same risk of which he had no knowledge.  For example, Defendants argued that Richard assumed the risk by holding onto the flex arm while he was removing it.  Defendants then proposed several theories about how the flex arm could have been removed more safely (i.e. holding the flex arm down during removal, tying the flex arm down with rope, using a ladder to approach the flex arm on the side instead of behind it), all the while knowing that Karsts could not rebut with their failure-to-warn evidence.  This evidence would have informed the jury that neither the user manual nor the warning label mentioned the need to use a separate platform or tie back the spring arm during repair.  All of this culminated in Defendants' closing argument with the statement, "I'm advocating for Shur-Co

and asking you to find Mr. Karst assumed the risk." It would be naive to disregard the real-world impact that this would have had on the jury.

[¶65.] Karsts' inability to present their evidence of the inadequate warnings to rebut the affirmative defense further compounded the error and the prejudice. I would reverse and remand to allow Karsts to present their evidence for the jury's consideration under a correct set of instructions.